Donald Ray WALLACE, Jr., Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 583S190.

Supreme Court of Indiana.

Dec. 6, 1985.

Rehearing Denied March 3, 1986.

William G. Smock, Terre Haute, for appellant.

Linley E. Pearson, Atty. Gen. of Ind., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Donald Ray Wallace, Jr., was found guilty by a jury in the Vigo Circuit Court of four Counts of Murder. The death penalty was sought on grounds that the killings were knowingly done in commission of a burglary and that Defendant had killed more than one person. The jury found Defendant guilty and recommended the death penalty in all four cases. The trial court judge subsequently agreed with the findings of the jury and sentenced Defendant to death. Nine issues are presented for our consideration in this Direct Appeal as follows:

1. Rulings by the trial court in regard to Defendant's competency to stand trial;

2. Denial of motion for change of venue from the judge;

3. Permitting a state witness to testify when that witness was incompetent;

4. Denial of motions for mistrial following references in the testimony to Defendant's past criminal record;

5. Alleged improper search and seizure of items from automobile driven by Defendant;

6. Denial of Defendant's request to have certain questions asked of police officer witnesses;

7. Alleged improper testimony of rebuttal witness;

8. Error in presentence report;

9. Constitutional infirmity of Indiana's Death Penalty Statute.

The facts tend to show that on January 14, 1980, Indiana State Trooper, Thomas Snyder, was called to the home of Ralph Hendricks which had been reported burglarized. In connection with the investigation, Trooper Snyder went to the Gilligans' house, next to Hendricks' house, to inquire whether the residents therein might have seen or heard anything unusual. The window to the Gilligans' back door was broken. Snyder checked inside the house and discovered four dead bodies in the family room. They were Patrick and Teresa Gilligan and their two children, ages four and five. Mrs. Gilligan had her hands tied behind her, and the two children were tied together. Coroner, David Wilson, M.D., testified that the cause of all four deaths, as listed on the inquests, was brain damage from gunshot wounds.

The evidence also showed that Defendant Donald Ray Wallace, Jr., was seen driving a blue Plymouth automobile on the night in question. This automobile belonged to Richard Milligan. Milligan and Milligan's girlfriend, Debbie Durham, were known to have committed several prior burglaries using this same automobile. However, Richard Milligan was in jail on burglary charges this particular night. Witnesses recalled seeing this automobile in the neighborhood about the time the murders occurred.

Donna Madison was at the home of her sister, Debbie Durham, the night in question. Earlier that evening she witnessed Wallace driving the blue Plymouth. Between 7:00 p.m. and 9:00 p.m., Wallace returned to Debbie's home, and Donna heard him ask for matches. He found a cigarette lighter, and Donna saw him in the backyard burning the jacket he had been carrying over his shoulder upon arrival. Neighbor Sherry Grayson saw a fire at the same time and saw a man with shoulder length hair, which was characteristic of Wallace, standing by it. Officer John Crosser recovered the remains of the jacket and other items found on the ground. Among these items were a set of wedding rings without stones in them and some fragments of glass. State Police Specialist Oliver examined the glass and found the pieces fit into a pattern matching the hole in Gilligans' window.

On the evening in question, Defendant Wallace and Debbie Durham had Carl Durham take pictures of them with many of the items taken from the Gilligan and Hendrick residences. The pictures, also showing money and pistols connected with these burglaries, were admitted into evidence.

Debbie Durham gave Serologist William Kune the blue jeans worn by Wallace the night of the crime, upon which Kune found type AB human blood. Wallace had blood type O, but Mrs. Gilligan and one of the children had blood type AB. Kune also found type B blood on a brown cotton glove, identified as one of a set Wallace wore while burglarizing homes. Mr. Gilligan had type B blood.

William Madison, brother of Debbie and Donna, came to Debbie Durham's home the evening in question and saw the Defendant come in. Defendant, wearing a gun in a holster, showed William Madison a briefcase with a couple of guns in it. Defendant also had in his possession a CB, a police scanner, and some rings. That same night Defendant attempted to sell to Randy Rhinehart some guns, a CB, and a scanner. Several witnesses testified that Debbie Durham displayed to them pieces of jewelry, which were later traced to the Gilligans. Debbie gave one of the rings to Officer O'Risky. It was identified by Dorothy Sahm, Teresa Gilligan's mother, as belonging to Teresa. A jeweler that had sized the ring and kept pictures of it also identified it as belonging to Teresa. There was a great deal of property in addition to that recited above which was found in Wallace's and

Durham's possession and which was traced to the Gilligans. Much of the property recovered that night was also traced to the Hendricks' residence. Entry was gained in both of the homes by putting tape on the window and then breaking it in, in a manner that reduced the sound of breaking glass. Wallace and Milligan were known to gain entry for purposes of burglary in this manner.

Friends of Defendant, Mark Boyles and Anita Hoeche, testified they received a phone call on January 15th from Defendant who said he was in trouble and in need of a ride. While riding in the car, Defendant told them he had gotten too greedy the night before. He said he had broken into one house and never should have gone to the next house because he got caught there. He told them after he got caught a man in the house was giving him trouble, and he had to tie up the entire family. He said the little girl was crying and screaming, and it was bothering him. He felt he could not let the children grow up with the trauma of not having parents, and he did not "want to see the kids went [sic] through the tragedy of seeing their parents being killed," so he killed them also. (Record at 5083.) He said the woman was screaming, and he had to shut her up. Later that night Defendant, while hiding in the attic of Hoeche's house, was arrested.

Wallace's statements coincided with those given by Debbie Durham. Debbie Durham testified that when Wallace visited her on January 14th, around 9:30 p.m., he immediately took his clothes off and gave them to her so he could change. On his blue jeans there was a piece of fleshy-whitish-red matter. Debbie asked what it was, and Wallace stated it had to be a piece of brain because he had shot the residents, who had caught him, in the head. He told her a man had come in from the garage and surprised him. They struggled, and Wallace made him bring in the rest of the family. He said he tied up the man, made the woman tie up the children, and then Wallace tied her up. He shot the man in the head after possibly breaking the man's neck in the struggle. He said he then shot the woman twice. The children were crying for the mother, so he shot each one of them once. He said he shot the adults because they could identify him.

I.

Defendant raises several issues concerning his mental competency to stand trial. Four hearings were held before the trial judge found Defendant was competent to understand the proceedings and assist his counsel in his defense. Defendant claims the trial judge's finding was error. The first hearing was instituted by the trial judge during a pretrial motion because the judge detected in Defendant's demeanor reasonable grounds to believe that he lacked competency to proceed. The court notified the parties of his concern and then appointed two psychiatrists, Dr. Larry Davis and Dr. John Kooiker, to examine Defendant. Their subsequent reports stated their opinions that Defendant was incompetent to proceed with trial because he was suffering from acute paranoid schizophrenia.

At a hearing held in May, 1980, the doctors described elaborate delusions expressed by Defendant of plots against him. He had told the doctors about his belief that the CIA and Masons were attempting to place him before a firing squad to prevent his release of secret matters, including information on the Iranian hostage situation. He expressed concern about others plotting against him, including his attorney and court personnel. He imagined radio-listening devices were planted in his cell and in the room where the psychiatrists interviewed him. He expressed suspicion of the psychiatrists and of all those with whom he came in contact. The appointed doctors concluded Defendant was unable to assist counsel at the time or to participate in and understand the trial proceedings. Each stated Defendant's apparent condition would be very difficult to feign. The State's two witnesses, Defendant's cellmate and a member of the Sheriff's department, testified Defendant displayed these

mannerisms only at selective times, the implication being Defendant was feigning the psychosis. After taking the matter under advisement, the judge found, in a May, 1980 Order, that Defendant was incompetent to stand trial. In that Order the judge stated that despite evidence to the contrary, his decision was based on an overwhelming evidence of incompetency given by the doctors.

Later, pursuant to Ind.Code § 35–36–3–3 (Burns Repl.1985), the Superintendent of Logansport State Hospital certified to the court that Defendant had now attained competency to stand trial. His certification was based upon a Dr. Matheu's opinion. However, the hearing scheduled pursuant to this certification was continued when Drs. Davis and Kooiker opined that Defendant needed further evaluation and treatment. After several ensuing months of treatment with Thorazine, Dr. Kooiker reported that Defendant had become oriented with time, place, and person. Both psychiatrists considered Defendant competent at this point to stand trial.

However, at the second hearing Defendant appeared too heavily sedated from the medication. The psychiatrists testified that Defendant's dosage of psychotic medication could be modified such that he would maintain competency, but not experience the sedative side-effects. Over Defendant's objection, the court ruled that Defendant's competency depended upon an adjustment in his medication, and ordered Defendant back to Wishard Hospital for further treatment. However, by the next and third hearing on January 16, 1981, Drs. Kooiker, Davis, and Moore opined Defendant was incompetent to proceed with trial. All three psychiatrists testified Defendant was again suffering from symptoms of schizophrenia and that the suggested modified treatment from the previous hearing had failed. One of the psychiatrists characterized Defendant as a chronic liar, but the general consensus of the doctors was that Defendant was not feigning the psychosis. Dr. Moore testified that if Defendant was faking, he was "one of the best damn actors he had ever seen." (Record at 114.) Once again, the court found Defendant incompetent to stand trial and ordered him committed under Ind.Code § 16–14–9.–1–10 (Burns Repl.1983).

Seven months later, in February, 1982, the State moved for another competency hearing, informing the court it could produce evidence that Defendant had been faking his psychosis. The court indicated he would hold another hearing, stating he had suspected Defendant had been feigning his mental illness. On June 16, 1982, over Defendant's objection, another competency hearing was held.

The State produced at the hearing several witnesses and documentary evidence purporting to show Defendant feigned his mental illness from the beginning. More specifically, the State introduced letters Defendant had written to Debbie, his girlfriend, during the time between his arrest and the first pretrial court appearance at which his competency was put in issue. These letters indicated a full understanding of what he was doing and were intended to show he purposefully feigned incompetency to delay his trial and frustrate the State's attempt to have him sentenced to death. In the letters he discusses Debbie's loyalty to him, their sex lives, and his feelings toward his attorney. He wrote he had a higher I.Q. than his attorney and so was planning to hire an attorney from San Francisco with the assistance of his uncle. His uncle would furnish the money for an attorney with the reputation for gaining acquittals for persons charged with murder. He said he was studying from materials furnished to him by a friend who was a professor from a local law school. His studies concentrated on suppression of evidence and the art of cross-examination. He indicated he was becoming very well informed on these subjects so that he would be in a position to attack the State in court and frustrate their case. Defendant also told Debbie, who was in jail on a burglary charge herself, that she would not have to worry if she went to the Women's Prison because he had connections in the prison that would get her special considera-

tion. He expressed in the letters a knowledge of the legal system and the procedures he was facing and would face in his desire to undermine the system. Notably, no reference is made to the delusions which convinced his psychiatrist of his incompetency except in the last letter written just before the first pre-trial hearing. This letter was written in his psychotic style, referring to the secret service and Masons being after him. The trial judge suspected it was written in preparation for the upcoming hearing and fit into Defendant's plan to launch his incompetency plan.

A former jailmate of Defendant testified that sometime in February or March, 1980, Defendant told him he was using the Masons story to get out of going to trial and stated Defendant would act psychotic only when non-prisoners were present. Two jailmates from Vigo County, Lofston and St. John testified that during 1980 Defendant would act perfectly normal unless the doctors were around. Defendant told him he was fooling the psychiatrist by telling them he was collaberating with the Germans. Lofston testified that sometimes the Defendant would give his medication to Lofston and other inmates, which would make them drowsy. St. John testified Defendant told him he was pretending to be crazy to evade trial. Defendant told St. John he saved up his medication for a hearing so he would be extremely drowsy in the courtroom.

Several of the staff members from Logansport State Hospital, where Defendant had been for most of the preceding two years, testified in the same manner. Robert Cosgray testified that when Defendant first came to the hospital he acted psychotic but shortly thereafter admitted to Cosgray that he was feigning his mental illness. Defendant later denied this statement and told Cosgray that it was Cosgray's word against his. He said he would rather spend his life in the hospital than go to the electric chair. William Hardesty testified Defendant exhibited his psychosis early in 1980, but later Defendant told Hardesty that he liked to "beat people at their own game." (Record at 1770.) Further,

Defendant told Hardesty that the longer he drags this out the less chance the State had of convicting him. (Record at 1770.) Others at Logansport, James Campbell, Deborah Illes, Wilma McLaughlin, Richard Younce, and William Conn, each testified that during the two years of Defendant's hospitalization they saw Defendant's alleged psychotic delusions manifested very rarely. He appeared to have psychotic delusions perhaps once or twice, and then only when Dr. Keating was present or about to enter the room. Several of the staff members stated that Defendant gave them a contrasting impression; he was a sharp pool and card player.

There were also letters introduced into evidence from Defendant's friend, Cathy Kellams. He had written her from September, 1980 to March, 1981. The letters reveal no psychotic symptoms and include only a discussion of an upcoming hearing on "this insanity shit." (Record at 1677.) Kellams testified that she also received one letter from Defendant in which he threatened her if she testified against him, but she stated she did not have the letter and could not produce it.

After hearing all of this evidence, the trial court concluded that Defendant was faking his psychosis and that he was in fact competent to stand trial. Defendant later asked the trial court to order that all of his medication be withdrawn from him, but the trial court found this to be a medical matter and denied the motion.

■ Defendant claims the court had no authority to institute the last competency hearing on the motion of the State. Defendant contends that the only way an additional hearing can be ordered is by notice from the institution that Defendant has now become competent to stand trial. Defendant has misconstrued the role of two separate statutory judicial proceedings. The first proceeding, which refers to the competence of a criminal Defendant to stand trial, was governed by Ind.Code § 35–5–3.1–1 (Burns Repl.1979) [repealed effective September 1, 1982; replaced by

Ind.Code § 35–36–3–1 (Burns Repl.1985)]. The other proceeding comes about from the regular involuntary civil commitment proceedings pursuant to Ind.Code § 16–14–9.-1–10 (Burns Repl.1979) [amended by P.L. 200–1983, § 2; now Ind.Code § 16–14–9.1–10 (Burns Supp.1985)]. The Title 35 Statute provides a means by which the issue of Defendant's incompetence to stand criminal trial may be raised and tested. This statute requires the court to hold a competency hearing whenever it has reasonable grounds for believing Defendant lacks the ability to understand or assist counsel. If the defendant is found incompetent, this custody is transferred to the Department of Mental Health. Title 35 also requires that after a nine-month period, defendant may not be retained absent a procedure for civil commitment under the Title 16 Statute. Ind.Code § 35–36–3–2 (Burns Supp. 1982) provides:

"Whenever the defendant attains the ability to understand the proceedings and assist in the preparation of his defense, the department of mental health, through the superintendent of the appropriate psychiatric institution, shall certify that fact to the proper court, which shall enter an order directing the sheriff to return the defendant. *The court may enter such order immediately after being sufficiently advised of the defendant's attainment of the ability to understand the proceedings and assist in the preparation of his defense.*" (emphasis added.)

The trial court properly ordered a hearing to inquire into Defendant's competency at the first pretrial hearing when it appeared there were reasonable grounds for believing Defendant was incompetent. An accused has a constitutional right not to be tried if he does not have the ability to comprehend the proceedings or to assist in his defense. *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815. However, the court further had the authority and duty to hold a hearing to determine the competency of Defendant when the court had been notified that Defendant had attained the ability to understand the proceedings and assist in the preparation of his defense.

 Defendant contends that when he was committed to the Department of Mental Health, pursuant to Ind.Code § 16–14–9.1–10, that the court lost jurisdiction to further inquire into his current competency to stand trial. This is not the law. When a Defendant is found mentally incompetent to stand trial, the trial court does not lose jurisdiction under Title 35, but retains jurisdiction to reconsider the matter at any time. *Marx v. State* (1957), 236 Ind. 455, 141 N.E.2d 126; *Finkenbiner v. Dowd* (1952), 231 Ind. 416, 108 N.E.2d 261, *reh. denied.* The trial of a defendant can be deferred because of a determination of his mental inability to stand trial. Meanwhile, the State continues to hold him pursuant to the probable cause that gave rise to his arrest and the charges filed against him. However, mental illness may be prolonged, and it is considered repugnant in our legal system to hold a person indefinitely pursuant to an arrest warrant without trial. So, a judicial determination must be provided to determine that he is mentally ill and gravely disabled, or dangerously in need of custody and treatment pursuant to Title 16. See *Wilson v. State* (1972), 259 Ind. 375, 287 N.E.2d 875. A Title 16 commitment determination of insanity is not a determination on the issue of a defendant's competence to stand trial and does not affect the jurisdiction to conduct criminal trial proceedings. *Marx, supra.* This is made apparent by the two distinct requirements of the Title 35 Statute. First, Title 35 requires the Department of Mental Health notify the court whenever in the opinion of that institution the defendant has attained the ability to understand the proceedings and is able to assist in the preparation of his defense. Second, it requires the trial judge to hold a hearing when he becomes aware of facts that reasonably appear to show defendant is now in a position to return for trial. This Court has held that the decision, whether to hold a hearing on competence to stand trial, lies in the province of the trial judge and should be dis-

turbed on review only upon a showing of clear error. *Malo v. State* (1977), 266 Ind. 157, 361 N.E.2d 1201. Here the trial judge was informed by the prosecutor that the State intended to show that Defendant had been feigning his psychosis from the beginning. These were sufficient grounds for the court to institute a fourth hearing and inquire further into the subject. The trial court committed no error in instituting and conducting the hearing and in making findings based on the evidence presented to him. On review this Court will not reweigh the evidence and will not overturn the trial court's factual determination unless it is not supported by the facts and their inferences. *Gosnell v. State* (1979), 268 Ind. 429, 376 N.E.2d 471. The trial court was not bound by the experts' testimony. *Howard v. State* (1976), 265 Ind. 503, 355 N.E.2d 833. There was a great deal of evidence, from a number of disinterested witnesses, that Defendant had been feigning his psychosis and which justified the trial court's finding that Defendant was competent.

■ Defendant claims he was denied due process of law because the Indiana statute on competency hearings does not state the burden of proof. He makes no specific allegations that the competency hearings were in fact unfair or that he was misled, surprised, or suffered from any misallocation of a burden. He cites a line of Illinois cases which held unconstitutional an Illinois statute on competency to stand trial and which allocated the burden of proof to the accused. *People v. McCullum* (1977), 66 Ill.2d 306, 5 Ill.Dec. 836, 362 N.E.2d 307; *People v. Thompson* (1967), 36 Ill.2d 332, 223 N.E.2d 97; *People v. Bender* (1960), 20 Ill.2d 45, 169 N.E.2d 328. However, Indiana's statute, Ind.Code § 35–36–3–1, does not allocate the burden to the Defendant. Our statute provides that whenever the court has reasonable grounds for believing the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, he shall immediately hold a hearing and determine whether the defendant has that ability. The statute further provides that any evidence relative

to defendant's abilities along those lines may be introduced. In a situation with a similar statute, the Missouri Court of Appeals in *Missouri v. Clark* (1976), Mo.Ct. App., 546 S.W.2d 455, *trans. denied*, declared that the only burden which exists rests on the trial judge to satisfy himself that the accused is or is not competent to stand trial. With regard to our competency statute, we maintain the same reasoning. There is no burden on the defendant to prove himself incompetent.

■ In the instant case, Defendant was not denied due process. The judge exhibited his understanding of the statutory law and his inclination to follow it. When it became apparent to him Defendant appeared to lack sufficient understanding, he ceased further proceedings and took the steps indicated by the Title 35 Statute. Despite the judge's reservations and doubt due to a conflict in the evidence, indicating Defendant may have been feigning his mental illness, the judge determined that the evidence of Defendant's incompetence outweighed those doubts and found Defendant incompetent. Thereafter, the judge ordered Defendant committed for treatment. Only when the judge was presented the very strong evidence in the fourth and final hearing did he change his ruling. Defendant, therefore, makes no showing of a lack of due process in the provisions of the statute and the ways in which they were applied to him by the trial court.

■ Appellant also claims the trial court erred in regard to the fourth and last competency hearing because the judge permitted the State to present evidence which was not newly discovered and that could have been introduced at earlier competency hearings but was not. Defendant is referring to the evidence introduced by the State of witnesses indicating Defendant was feigning his psychosis from the beginning and was determined to be incompetent to stand trial. Defendant's argument seems to be that this evidence was stale and not probative of his mental state in

1982. We do not agree. It certainly was relative to the trial court's determination of competency in 1982 that Defendant had expressly been carrying out a plan of feigning psychosis all during these proceedings. It is true Defendant's actions and attitude in 1980 could not be conclusive of Defendant's mental condition in 1982. However, the fact that the same psychiatrist noted the same indication of psychosis in Defendant in 1982 as in 1980 and 1981, and that other witnesses believed for good reason Defendant was feigning these indicators, was clearly relevant to the judge's duty to determine competency in 1982. In this light, the witnesses' testimony attacked by Defendant was not stale since it tended to show a pattern over the period of more than two years. It helped the trial judge to assess Defendant's true state of mental health under consideration in 1982. In matters bearing on the related issue of insanity at the time of the offense, this Court has held that all evidence is admissible which relates to Defendant's behavior or environment and has some logical reference to the issue of his sanity. *Howard v. State, supra.* It was, therefore, not an abuse of discretion for the trial court to admit evidence of earlier and successful attempts to feign incompetence which were in fact based on the same symptoms.

█ After Defendant was ruled competent to stand trial he filed a "Motion To Determine The Propriety Of The Defendant Receiving Medication." (Record at 414.) The motion stated that since the time the court determined Defendant competent to stand trial, Defendant's prescription for antipsychotic medication had been renewed by the Vigo County jail physician and was being administered. In his motion, defense counsel stated his concern that the medication might affect Defendant's ability to assist counsel and understand the proceedings and that it might affect his demeanor, thereby prejudicing the jury against him. The motion also stated that if the drugs were necessary to render Defendant competent, that such chemical competency was not proper. The motion went on to allege the court could not consistently decide De-

fendant was feigning and at the same time leave him on antipsychotic medication. He, therefore, requested the court to determine and rule whether the medication was necessary to maintain Defendant's competency and whether such chemical competency was permitted under Indiana law. He then requested the court to order the Sheriff to halt the administration of the drugs if it was determined that drugs were not necessary. In responding to this motion the court generally found that this was a medical and not a legal issue. The court responded with written findings and conclusions that counsel's concern that the medication was rendering Defendant incompetent was unfounded since he had just been declared competent. The court ruled that although he believed an accused could constitutionally be made chemically competent, he did not believe Defendant required the medication to be competent. Therefore, he would not rule specifically on chemical competency since that question was not before him. The court did find, however, that Defendant understood the effects of the drugs and could competently discuss with his psychiatrist whether or not to continue taking it. It was a medical and not a legal issue. Defendant does not claim, nor does the record reveal, that he was in fact medicated at trial or that medication altered his demeanor in any manner. He shows no prejudice from the trial court's ruling. Furthermore there is no showing nor a claim by the Defendant that any mishap occurred during trial that required the trial judge to take any action with regard to the issue raised in this motion. He merely states the trial judge erred by not making a definite ruling at the time the motion was presented. No error is shown on this issue.

## II.

█ Appellant claims the trial court erred by denying him a change of judge requested about the time of his fourth and last competency hearing. Defendant had already been granted an initial change of venue from Vanderburgh to Vigo County.

The basis for the motion for change of judge was an allegation of bias and prejudice. It was supported by a letter written by the judge in 1980 in which he inquired of the Department of Mental Health information regarding a determination of competency of the Defendant to stand trial. In the letter the judge referred to concerns expressed by jailers about an alleged escape scheme and coded letters being exchanged by Wallace and a friend. He also expressed the fact that this was a very serious matter involving four murders and that there was some evidence that Defendant may be feigning his alleged incompetency. In this motion Defendant also referred to the trial judge's expression at the fourth hearing that the judge had had doubts all along that Defendant may be feigning his incompetency.

The posture of the trial court for a change of judge at this point in the trial is a discretionary matter and a trial court will be found in error on appeal where it is shown that the judge was clearly biased and prejudiced. Such clear bias or prejudice only exists where there is an undisputed claim or where the judge has expressed an opinion on the merits of the controversy before him. *Holguin v. State* (1971), 256 Ind. 371, 269 N.E.2d 159; *Pollard v. State* (1969), 252 Ind. 513, 250 N.E.2d 748, *reh. denied.* In the letter to the Department of Mental Health the trial judge expressed concern over allegations, relayed to him by jailers and the prosecuting attorney, regarding an escape attempt and conflicting indications that there was an issue of competency before him. The letter was written on May 19, 1980, about the time of the first competency hearing in May 1980. The record shows the trial court stated that there was some evidence that the psychosis was being feigned but still found, in favor of the weight of evidence, that Defendant was incompetent. Although the trial judge stated that he had these doubts, he still followed the law by finding Defendant incompetent and ordering him to be committed on three different occasions. Only after hearing very strong evidence from a number of witnesses that Defendant was in

fact competent and was feigning his psychosis did the trial judge change his findings. Defendant does not show that the court was biased on the issue of his guilt or innocence nor is there any showing that the conduct of the trial on the merits was affected in any manner by the trial judge's bias. Prejudice must be shown by trial conduct of the judge and not inferred from his subjective views. *U.S. v. Menk* (1968 7th Cir.), 406 F.2d 124, *cert. denied* (1969), 395 U.S. 946, 89 S.Ct. 2019, 23 L.Ed.2d 464. There is no error on this issue.

### III.

It is Appellant's contention the trial court erred in permitting witness, Richard Milligan, to testify based on the questionable mental competence of Milligan. Milligan had been diagnosed as a paranoid schizophrenic and had a history of hallucinating. The trial court conducted a hearing outside the presence of the jury for *voir dire* examination of Milligan and found him to be competent. Milligan testified that his condition was being controlled by anti-psychotic and mood-elevating drugs and that he was not then suffering from the symptoms. He stated that as long as he took the prescribed drugs he would not have the symptoms. His testimony was that he had not been hallucinating since the previous winter when he had been off of his medication for a few days. He said that he was able to tell when he was having problems and was hallucinating. He testified he was taking his drugs and was not having any problems at that time. His testimony involved his commission with Defendant and a third person of several burglaries in which they taped the glass before breaking it. This was the same manner in which the glass was broken in this case. His testimony was that the Defendant was the "brains" of their operation and had devised the system of entry without detection. Entry was gained in this manner in the prior crimes about which he testified. Thus, his testimony tended to show a common plan or scheme, identifying Defendant as the perpetrator of the instant crime. It

appears the witness inadvertently referred to some other burglaries he, Defendant, and a third person had committed. This court will not disturb a trial court's determination of a witness's competency to testify if the court had an opportunity to observe the witness and if the evidence on his competency is susceptible of conflicting inferences. *Page v. State* (1980), 274 Ind. 264, 410 N.E.2d 1304. In *Gosnell v. State* (1978), 268 Ind. 429, 376 N.E.2d 471, this Court held that it is a general rule that witnesses are clothed with a presumption of competency and when that competency is placed in issue it is the duty of the trial court to schedule a hearing in order to properly determine whether the witness is in fact competent to testify. We further stated that the trial court has wide discretion in disposing of petitions of this kind and will be reversed only if it has clearly abused that discretion. Here the trial court did conduct such a hearing, was able to observe this witness and make a determination as to his apparent incompetency. He was also able to observe whether or not the witness's competency was in such doubt that further investigation such as examination by a psychiatrist was necessary. Milligan, in fact, testified in cogent, narrative style and responded to questions while relating facts in both *voir dire* and before the jury. There is no showing that this witness demonstrated any incompetency before the jury and, of course, the jury had before them all of the information of his mental problems and was able to determine his credibility based on these facts. Accordingly, there is no error in this issue.

### IV.

 Defendant claims the court committed reversible error when it refused to grant a mistrial in two instances in which witnesses volunteered statements referring to Defendant's past criminal involvements. Richard Milligan testified that he and Defendant committed three burglaries together in December, 1979. Milligan testified Defendant was the leader in each of the three burglaries and Defendant used masking tape on the windows to reduce shattering and noise. Because tape was also used on the Gilligans' window, this testimony was admitted under the common scheme or plan exception to the general rule against admittance of evidence of prior crimes. Defendant has raised no question about the admission of these three offenses of burglary and does not claim that the use of masking tape insufficiently constituted a common scheme. His complaint comes with reference to the answer Milligan gave to the prosecutor's question, "I guess you testified that your first burglary was on the 25th?" Milligan's answer was, "We did some before then, but I didn't get charged with them." (Record at 4852.) Defendant then moved for a mistrial. Also, State's witness, Mark Boyles, testified that he and Anita Hoeche drove Defendant around Evansville the day after the murders. Defendant was a suspect by then. The state questioned Boyles as follows:

Q. "Okay. When you got—when the defendant got in the car, did anyone ask him what the police were after him about?"

A. "Uhh—no. Anita had an idea when we went to go pick him up. I seen his picture on the news that night and knew the police were after him, but I didn't know what for. I knew he had been in the penitentiary before and was—."

(Record at 5004.) Defendant moved for a mistrial on the basis of the reference to the defendant having been in the penitentiary. Defendant claims both of these statements by these witnesses prejudiced him at trial and during the death penalty proceedings. Both motions for mistrial were denied by the trial court but he admonished the jury to disregard the unresponsive answers. The granting of a mistrial lies within the sound discretion of the trial court, and its determination will be reversed where an abuse of that discretion can be established. *Ramos v. State* (1982), Ind., 433 N.E.2d 757, *reh. denied; Chambers v. State* (1981), Ind., 422 N.E.2d 1198, *reh. denied.* A mistrial is an extreme remedy and is

warranted only where lesser curative measures will not suffice. Furthermore, even if error occurred, it may be harmless if the evidence admitted was merely cumulative and the conviction was otherwise supported by independent evidence. *Hazzard v. State* (1980), 274 Ind. 679, 413 N.E.2d 895.

The trial court ruled that Milligan's reference to the other burglaries could not have substantially prejudiced Defendant in light of Milligan's proper testimony about the three burglaries showing a common scheme. Defense counsel asked a previous State's witness, who spoke with the Defendant the day after the murders, if Defendant was concerned about the sentence he could receive since he had already been in so much trouble. The witness had responded in the affirmative. Mark Boyles' statement that Defendant had been in the penitentiary occurred after defense counsel asked this question of the witness. Also, Carl Durham, had testified earlier that Defendant wanted the photograph of himself and the drugs, money, and guns to send to his friends in prison. Moreover, Milligan had already testified about the December burglaries he and Defendant had committed together. Given that the jury had already heard considerable testimony, strongly implying Defendant's active criminal past, it does not appear that the statements by the two witnesses could have substantially influenced the verdict. Any error committed was harmless beyond a reasonable doubt since the testimony was cumulative of a substantial amount of other evidence. There was also substantial evidence of Defendant's involvement in this crime, the seriousness of which far outweighed any general references to previous burglaries or time spent in a prison institution. *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh. denied.* There is no error demonstrated by this issue.

### V.

Defendant contends the court erred in denying his motion to suppress evidence seized during the search of Richard Milligan's Plymouth automobile. The automobile was searched after a warrant was obtained and Milligan's consent to search the automobile was obtained. Appellant does not contest the issuance of the search warrant to search the interior of the automobile as being without probable cause nor does he allege that the search of the interior of the automobile was improperly conducted pursuant to the search warrant. His only claim is that the initial seizure of the automobile was improper and that therefore any evidence obtained from it thereafter was tainted and inadmissible.

The automobile belonged to Richard Milligan and had been used by Milligan and Defendant in the December burglaries. However, after they were both arrested and incarcerated only Defendant was released on bond. Milligan gave Defendant permission to drive the automobile, which he did during January and on the night of these murders. The morning after the murders, Debbie drove the car to the grocery store. After breakfast Defendant left without the automobile and without telling Debbie. It was apparent at that time that he was a suspect and that the police would be looking for him. Debbie drove the automobile to an apartment on Eichel Street to sell some furniture. She was arrested there, and the police took custody of the automobile, having it towed and impounded. Then they obtained a search warrant and searched the interior of the automobile, finding many items traced to the Gilligan and Hendricks burglaries.

There is a legitimate question as to whether Defendant had standing to contest the search of this automobile. The owner of the automobile had given consent to the police to search it. Defendant's possession was only temporary, and he had apparently abandoned it at the time of the search, and it was in the possession of a third person. It is questionable that he had a legitimate expectation of privacy in it at the time it was seized. *Pollard v. State* (1979), 270 Ind. 599, 388 N.E.2d 496. However, beyond this question there is ample evidence that police had probable cause to

seize the vehicle since they had many facts justifying them in suspecting that it had been used in the commission of these crimes. First, the police knew the automobile belonged to Milligan and had been used in previous burglaries by Milligan, the Defendant, and a third person. Second, the police had early on that morning learned that entry into the Gilligan house had been gained by the same method used by Milligan and the Defendant in the past. They were therefore familiar with the Plymouth automobile from previous investigations of Defendant and Milligan and knew it had been used in this manner before. Defendant was the only suspect because Milligan was in jail at the time. Third, there were also witnesses who indicated this automobile was in the Gilligan neighborhood at the time of the murders. Next, Donna Madison had told police officers earlier that Defendant had come to the house in this automobile in possession of guns and jewelry and burned his jacket the night in question. However, it is not known with certainty whether the police who did the towing actually knew about this particular statement. There is ample evidence, however, that the police had information that gave them sufficient probable cause to take the vehicle into possession at the time they arrested the driver. This is true particularly since it would have involved leaving the vehicle on a public street accessible to the suspect who was then at large while obtaining a warrant. The mobility of the vehicle has long been a justification for warrantless seizures based on probable cause. These were exigent circumstances that justified the trial court in finding the seizure was justified. *Chambers v. Maroney* (1970), 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, *reh. denied. Stuck v. State* (1970), 255 Ind. 350, 264 N.E.2d 611.

## VI.

Appellant next assigns as error the trial court's granting to the State a motion in limine regarding two questions Defendant requested to be asked of a State witness. The court granted the motion in limine, but the Defendant preserved the question by attempting to elicit the testimony from the police officer, the State's witness, and was prohibited from doing so by the trial court. It is this final ruling denying his attempt to introduce this evidence which is alleged as error.

After Defendant's arrest, he requested a polygraph test and requested that he be asked two questions: whether he was present when the murders occurred and did he pull the trigger. The State objected to any mention of offers to take polygraph tests, and then the defense sought to introduce evidence that Defendant had said he wanted to be asked these two questions, omitting the context of the offer to take a polygraph test. During the testimony of the police officer, Defendant requested permission to ask him if it was not a fact that he had requested these two questions be asked of Defendant after his arrest. Although it is not clear, apparently Defendant's purpose in requesting these questions was to give him an opportunity to state he was not in the Gilligan house at the time of the murders but was in the Hendricks' house committing robbery. This would imply his accomplice had gone into the Gilligan house and committed the murders. He is not claiming he was prevented from putting testimony in that regard into evidence. He is only complaining that he could not show to the jury that he made a request for those two questions, and the request was refused.

The State's contention is that any evidence tending to show that Defendant sought to have these questions asked of him was both irrelevant and prejudicial as self-serving utterances. We agree. Defendant's argument is that answers to these questions would not have been self-serving. He argues the answers would have put him at the scene of a burglary of the neighboring house and would have been an admission against interest since it would be tantamount to a guilty plea to burglary. It is apparent, of course, being found guilty of burglary of one house would be far preferable to being found guilty of being in the Gilligan house and

committing four murders for which the death penalty was sought.

The trial court is accorded with wide latitude in ruling on the relevancy of evidence. *Snider v. State* (1981), 274 Ind. 401, 412 N.E.2d 230, *reh. denied.* This latitude is vested in the trial court to determine the probative value of evidence vis-a-vis its prejudicial impact. If the offered evidence is only marginally relevant, it is within the sound discretion of the trial court to determine its admissibility. *Chittenden v. State* (1982), Ind., 436 N.E.2d 86; *Marchand v. State* (1982), Ind.App., 435 N.E.2d 284, *reh. denied.* Defendant fails to demonstrate the relevancy of his request of these questions to the determination of guilt or punishment for the crime under investigation. It is speculative, at best, that it would have allowed him a substantial opportunity to prove he was in the other house at the time of the murders. If such were the facts, this did not foreclose him an opportunity to bring such facts to the jury. We therefore see no abuse of discretion in the trial court in denying his efforts to get the questions asked.

## VII.

Appellant next claims it was error for the trial court to permit the testimony of the mother of Theresa Gilligan regarding the ownership of a pair of gloves. During its investigation the police found a pair of brown jersey gloves at the scene of the murders. The gloves, which were bloodstained, were introduced by the State. During its case in chief the defense introduced a pair of Isotoner gloves. On Friday, the defense called Donna Madison who testified that the Isotoner gloves belonged to Defendant, that he had been wearing them the night of the murders and that she found them in her house after the murders. The purpose of the defense presenting this evidence was to promote the inference that Defendant was next door burglarizing the neighbors' house. That is, if Defendant wore Isotoners and brought them to Donna Madison's house, then the brown jerseys at the scene must have belonged to an accomplice and not to the Defendant. After Donna Madison's testimony on Friday, the Defendant succeeded in getting the Isotoner gloves placed into evidence. During the weekend recess, the State learned from Mrs. Gilligan's mother, Mrs. Sahm, that the Isotoners belonged to her daughter who had been wearing them the night she was murdered. Thus, she could testify that the gloves in Donna Madison's house were brought there by the Defendant and were the property of one of the victims of this crime. The record shows that the gloves were rather distinctive in that they had tan leather strips on each finger and thumb and across the back, and also had a decorative label. Mrs. Sahm was able absolutely to identify the gloves as belonging to her daughter and further testify that her daughter was wearing those gloves on the night she was murdered.

On Monday morning when the trial resumed the defense brought police officers who corroborated Donna Madison's testimony by stating that she had told them during the investigation that the Isotoner gloves found in her house belonged to Defendant. The State then called Mrs. Sahm in rebuttal to give her testimony indicated above. Defendant claims the State did not inform him of Mrs. Sahm's expected rebuttal testimony, although it did communicate with defense counsel on other matters. Defendant asserts that because he was not armed with the knowledge of Mrs. Sahm's statement, he called two police officers on Monday morning who placed him in a position of being "sandbagged" by Mrs. Sahm's testimony. Generally, when discoverable evidence is not revealed until the State seeks its introduction, the defense has two courses of action that it may seek: a continuance or the exclusion of the evidence. *Reid v. State* (1978), 267 Ind. 555, 372 N.E.2d 1149. Defendant moved first for exclusion of the evidence and then for a continuance. Exclusion would be the appropriate remedy where the State has acted in bad faith and failed to comply with the discovery order or where exclusion is the only remedy which would avoid a substantial prejudice to the defendant's rights. It

is within the trial court's discretion to determine if any harm resulted from such alleged violation. However, absent clear error this Court will not reverse the ruling of the trial court. *Id.*

Here it is clear, and the defendant does not deny, that the State did not learn of Mrs. Sahm's statement until after Donna Madison had testified on Friday. It is also clear that the testimony Defendant introduced Monday morning via the police officers was nothing more than cumulative of the direct testimony given by Donna Madison and the Isotoner gloves which had been introduced into evidence. Clearly, the trial court could have determined in its discretion that Defendant was not prejudiced by the alleged discovery violation because it was cumulative of other evidence. Reversal should not be predicated on the erroneous admission of evidence when evidence of the same probative value is admitted without objection. *Sutton v. State* (1981), Ind.App., 422 N.E.2d 430. Even improperly admitted evidence does not require a reversal if it is cumulative of other evidence already before the jury. *Hazzard v. State, supra.* The trial court did not abuse its discretion to the prejudice of Defendant in permitting the testimony of Mrs. Sahm. *Chandler v. State* (1981), 275 Ind. 624, 419 N.E.2d 142.

### VIII.

Appellant claims error was committed in his sentencing in that the presentence investigation report from the probation officer did not conform to the mandates of Ind.Code § 35-4.1-4-10 [35-50-1A-10 (Burns 1979)] [repealed and replaced by Ind.Code § 35-38-1-9 (Burns Repl.1985)]. Ind.Code § 35-4.1-4-10 provides as follows:

"*Scope of presentence investigation and report—Solicitation of victim's statements.*—(a) The presentence investigation consists of the gathering of information with respect to the circumstances attending the commission of the offense, the convicted person's history of delinquency or criminality, social history, employment history, family situation, economic status, education and personal habits. Such investigation may also include any other matter which the probation officer conducting the investigation deems relevant to the question of sentence, and must include:

(1) Any matters the court directs to be included;

(2) Any written statements submitted to the prosecuting attorney by a victim under IC 35-5-6 (35-5-6-1—35-5-6-5); and

(3) Any written statements submitted to the probation officer by a victim.

(b) If there are no written statements submitted to the probation officer, he shall certify to the court:

(1) That he has attempted to contact the victim; and

(2) That, if he has contacted the victim, he has offered to accept the written statements of the victim, or to reduce his oral statements to writing, concerning the sentence, including the acceptance of any recommendation.

(c) *As used in this section, the terms 'recommendation' and 'victim' have the meanings set out in IC 35-5-6-1.*" (emphasis added.)

In the instant case there was no statement from a victim in the presentence report, nor any certification from the probation officer that there was an attempt to obtain one. Appellant contends that as a result of this inaction, he should now be entitled to have his case remanded to the trial court for resentencing, citing *Busam v. State* (1983), Ind.App., 445 N.E.2d 118. We disagree.

Appellant is incorrect in his assertion that Mrs. Sahm, Theresa Gilligan's mother, was a "victim" under Ind.Code § 35-4.1-4-10. Reference in this statute to the definition of "victim" is to a plea bargaining statute found at Ind.Code § 35-5-6-1 (Burns Repl.1979), which provides as follows:

"*Definitions.*—As used in this chapter:

(a) 'Prosecutor' means prosecuting attorney or deputy prosecuting attorney.

(b) 'Recommendation' means a proposal by the prosecutor to a court that:

(1) A charge be dismissed; or

(2) A defendant, if he pleads guilty to a charge, receive less than the maximum penalty permitted by law.

(c) 'Victim' means a person who has suffered harm as a result of an offense. [IC 35-5-6-1, as added by Acts 1975, P.L. 332, § 1, p. 1768; 1978, P.L. 146, § 1, p. 1331.]"

The intention of the Legislature in Ind. Code § 35-4.1-4-10 is clearly to provide the victim an opportunity to make a statement to the sentencing judge. It refers only to the immediate and actual victims of an offense, which in this case were obviously unable to make any statements.

Appellant attempts to have subsequent provisions of the plea bargaining statutes, which provide that the next of kin of the actual victim be contacted when the actual victim cannot be contacted, apply to this case. In the chapter governing the plea bargaining process, Ind.Code § 35-5-6-5 (Burns Repl.1979) [recodified at Ind.Code § 35-35-3-7 (Burns Repl.1985)] provides that if a victim is deceased or under the age of eighteen (18) years, the prosecuting attorney is required to go to the next of kin or the parent/guardian or custodiam of the victim. It further provides for corporate or governmental entity representation. Under that same chapter, Ind.Code § 35-5-6-4 (Burns Repl.1979) [recodified at Ind. Code § 35-35-3-5 (Burns Repl.1985)] provides as follows:

"*Certification of notice to victims required—Effect of noncompliance.*—As a part of the recommendation submitted to the court, the prosecutor must certify that he has offered to show the proposed recommendation to the victims of the felony, if any, and that they have been offered an opportunity to present their opinion of the recommendation to the prosecutor. *This section is for the benefit of the victim and gives no additional rights to the defendant. Failure to comply gives no grounds for post-conviction relief.* [IC 35-5-6-4, as added by

Acts 1978, P.L. 146, § 3, p. 1331.]" (emphasis added.)

These sections expand the definition of "victim," thereby expanding the duty to receive input from the "victim," but only in the context of plea bargain proposals. We do not construe these expansive provisions as applicable to Ind.Code § 35-4.1-4-10 governing presentence reports in general.

It is clear that these statutes were primarily intended to address the social concerns for victims' rights so that a victim of a crime might have an opportunity to address the court concerning proper punishment. This was seen to counter societal perceptions that the Legislature and Courts are unconcerned with the victims' sense of justice in a particular case. In the instant case, Defendant is being sentenced after being tried and convicted, as opposed to engaging in the plea bargaining process in which charges may be dismissed or sentences reduced. Note, that the definition of "recommendation" contemplated in the plea bargaining statutes, and incorporated in Ind.Code § 35-4.1-4-10 by language therein, means a proposal that a charge be dismissed or a defendant receive less than the presumptive sentence. The Legislature specifically referred to Ind.Code § 35-4.1-4-10 to Ind.Code § 35-5-6-1, and not to any other subsequent provisions in Chapter 5. In addition, the Legislature separately and specifically expanded the definition of "victim" when the proceedings entail plea bargaining. We interpret this to mean the Legislature did not intend for Ind.Code § 35-4.1-4-10 to incorporate any other provisions except Ind.Code § 35-5-6-1, referring to actual victims.

Further, there is no indication these statutes were intended as Defendant would have us construe them, namely: to create a right on the part of Defendant to have particular information included in his presentence report. On the contrary, Ind. Code § 35-5-6-4 explicitly states it is designed for the benefit of the victims and gives no additional rights to defendants. Ind.Code § 35-5-6-5 broadened the definition of "victim" and created more stringent

requirements by bringing the actual victim's next of kin into the process. It is obvious that the intent of these statutes is to respond to an attitude of victims that might feel the defendant will be sentenced too leniently and not as an additional provision to benefit the defendant.

It follows from this analysis that we do not agree with the Court of Appeals' decision in *Busam v. State, supra,* wherein remand was ordered to the trial court because the victim's statement contained nothing concerning the sentence. It is true Ind.Code § 35-4.1-4-10 is mandatory and should be complied with by the courts. However, it does not necessarily follow that failure to comply strictly with the statute gives a defendant a right to require any action on appeal or requires this Court to find error in the sentencing. It is well settled that a defendant is not entitled to relief on appeal unless he can demonstrate he was prejudiced by the error he asserts. *Pettit v. State* (1979), 272 Ind. 143, 396 N.E.2d 126. There was no actual victim remaining alive in this case, and the rights accorded under Ind.Code § 35-4.1-4-10 do not inure to the benefit of Defendant. Therefore, there is no showing that Defendant was in any way harmed by his allegations of error with regard to the presentence report.

## IX.

Finally, Appellant claims our death penalty statute is unconstitutional in that it lacks a definite procedure governing both the penalty phase jury hearing and the appellate review of the death penalty. He claims that the Legislature has not established a meaningful procedure for review by this Court and this Court has failed to establish guidelines or rules for such review, that the statute fails by reason of not requiring the trial court to make findings of fact, that the statute fails to require specific findings on capital issues and that the statute does not sufficiently define the scope of the evidence relevant and admissible at the penalty phase hearing. This Court has repeatedly dealt with these precise issues and decided them adverse to Defendant's position. *Averhart v. State* (1984), Ind., 470 N.E.2d 666; *Burris v. State* (1984), Ind., 465 N.E.2d 171; *Schiro v. State* (1983), Ind., 451 N.E.2d 1047, *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699; *Williams v. State* (1982), Ind., 430 N.E.2d 759, *cert. dismissed,* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47. No error is presented in this issue.

■ This Court must now decide whether the death penalty is appropriate considering the nature of this offense and the character of the offender. At the commencement of the sentencing hearing the court recited for the jury the possible aggravating and mitigating factors. Following trial, the jury recommended the death penalty.

The court then found that the State had proved beyond a reasonable doubt the aggravating factors provided for in Ind.Code § 35-50-2-9 (Burns Repl.1985), that each of the murders was committed during the perpetration of a burglary, and that Defendant had murdered more than once. Although the court did not list each possible mitigating factor and dispose of it, he found that there were absolutely no mitigating factors to be weighed against the aggravating ones. The trial court's findings are amply supported by the record. As to its finding that no mitigating factors existed, the presentence report as well as the evidence at trial showed Defendant had a significant criminal history. Although evidence was adduced at sentencing that Defendant suffered from an insecure and loveless childhood, there was no evidence that he suffered from extreme mental disturbance. The evidence was clear that the four victims in no way participated in or consented to Defendant's conduct. Although Defendant attempted to show that an accomplice committed the murders while he was committing a burglary in a neighboring house, the evidence to the contrary is overwhelming. There was substantial evidence that Defendant committed these acts without the aid of anyone else and that he was not under someone else's domina-

tion. All circumstances further showed that Defendant appreciated the wrongfulness of his act, demonstrated by his detailing the deed to many others, his expressions that he was clever enough to and had "beat the system," and his having his picture taken with items from the Gilligan and Hendricks homes for the purpose of sending them to his friends in prison. He not only appreciated the wrongfulness of his acts but showed no remorse and, furthermore, considered his acts creditable accomplishments. There is overwhelming evidence here sufficient to convict this defendant of these crimes beyond a reasonable doubt and to prove the aggravating factors beyond a reasonable doubt. No reasonable person could find that the death penalty in this case was arbitrarily or capriciously applied or that it is unreasonable or inappropriate. We therefore affirm the trial court in all things, including the imposition of the death penalty.

This cause is remanded to the trial court for the purpose of setting a date for the death penalty to be carried out.

GIVAN, C.J., and SHEPARD, J., concur.

DeBRULER, J., concurs in result and dissents with separate opinion in which PRENTICE, J., concurs.

DeBRULER, Justice, concurring in result and dissenting.

Among the trial court's written findings of fact on the imposition of the death penalty, are the following two:

"I find that the Defendant Donald Ray Wallace, Jr.'s conduct and behavior following the commission of the offenses indicated his intent to conceal his act, that his conduct surrounding the circumstances of this case showed a total disregard for human life, and *that the imposition of anything less than the death penalty would depreciate the seriousness of the offense.*"

"8. The Court finds that the State has proved beyond a reasonable doubt that two aggravating circumstances exist that

warrant the imposition of the death penalty:

A. That the Defendant, Donald Ray Wallace, Jr., *murdered* Patrick Gilligan, Theresa Gilligan, Lisa Gilligan and Gregory Gilligan, while committing the crime of Burglary on the 14th day of January, 1980, in Vanderburgh County, State of Indiana. (I.C. 35–50–2–9(b)(1).

B. That the Defendant, Donald Ray Wallace, Jr., *murdered* Patrick Gilligan, ..." (emphasis added)

The sentencing court has departed in these findings from the death penalty statutes in two respects. In the first, the court has utilized a factor applicable only in non-death sentencing as an aggravating circumstance. I.C. 35–38–1–7(b)(4) governing non-death sentences provides:

(b) The court may consider the following factors as aggravating circumstances or as favoring imposing consecutive terms of imprisonment:

\* \* \* \* \* \*

(4) Imposition of a reduced sentence or suspension of the sentence and imposition of probation would depreciate the seriousness of the crime."

To the extent that the judge's death decision rests upon this criterion as an aggravating circumstance, it is erroneous. The death sentence statutes does not incorporate this criterion as an aggravating circumstance. This court has said, and I agree, that the death sentence statute ".. gives clear and specific guidance to the sentencing authority and adequately protects each individual's constitutional rights". *Williams v. State* (1982), Ind., 430 N.E.2d 759, *Davis v. State* (1985), Ind., 477 N.E.2d 889 (separate opinion of DeBruler, J. concurring and dissenting, *Smith v. State* (1985), Ind., 475 N.E.2d 1139 (separate opinion of DeBruler, J. concurring and dissenting). By the same token a departure from the guidance of the statute undermines that protection against an arbitrary decision that the defendant deserves death rather than imprisonment.

The second departure is in the court's critical finding of the aggravating circum-

stance alleged on the basis of I.C. 35–50–2–9(b)(1). That statutory aggravating circumstances is as follows:

> "(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit.... burglary ..."

As trial prosecutor Levco accurately argued during his statement to the jury in the death penalty phase of the trial, the jury's attention under this alleged circumstance, in the aftermath of the verdicts of guilty of felony murder pursuant to I.C. 35–42–1–1(2), must focus upon whether the killings were intentional. There is no finding by the sentencing court in its written findings set forth above, that appellant intentionally killed the victim, rather the court finds that the appellant "murdered" them, the term murder encompassing both a knowing and intentional killing. While the evidence supports a finding of intentional killings, that finding is for the sentencing judge to make and accurately record, and is not for this court in reviewing the sentence. I would therefore remand for further proceedings to conform to the death statute.

There is a nagging doubt, arising from this court's frequent confrontation in reviewing death sentences with the finding of absolutely no mitigating circumstances, that the mitigating circumstance search required by the death statute is either being misunderstood, misapplied, or not reflected in sentencing court findings. In my opinion it needs to be reiterated and emphasized for the guidance of judges and lawyers that a finding of the existence of a mitigating circumstance does not preclude a positive death decision. Second, to regard the aggravating circumstance or circumstances as so horrendous as to withstand all and any conceivable mitigating circumstances, without identifying appropriate mitigating circumstances on the record, clearly "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). I would therefore add to the remand in this case,

the requirement that the trial court make a special finding dealing with appellant's long history from childhood of special mental health care, the court's own previous finding that he was not competent to stand trial, and the fact that appellant was being administered drugs during the trial. It is difficult to accept the proposition that such history should have no weight whatever in making the death decision.

PRENTICE, J., concurs.