**UNITED STATES, Appellee,**

v.

**Ronnie A. CURTIS, Lance Corporal,
U.S. Marine Corps, Appellant.**

No. 63,044.
NMCM 87–3856.

U.S. Court of Military Appeals.

Argued Aug. 29, 1990.

Decided April 18, 1991.

For Appellant: *Robert E. Morin* and *Lieutenant Commander John B. Holt,* JAGC, USN (argued); *Captain Arthur R. Philpott,* JAGC, USN, *Lieutenant Commander L. Saccoccio,* JAGC, USNR–R, *Lieutenant Commander Susan K. Milliken,* JAGC, USN, *Captain Dwight H. Sullivan,* USMCR, *Lieutenant Frederic D. Firestone,* JAGC, USNR, *Lieutenant Thomas E. Miro,* JAGC, USNR (on briefs).

For Appellee: *Major Thomas D. Miller,* USMC, and *Lieutenant Commander Lawrence W. Muschamp,* JAGC, USN (argued); *Commander Thomas W. Osborne,* JAGC, USN and *Lieutenant Colonel Joseph S. Uberman,* USMC (on briefs); *Lieutenant Scott A. Hagen,* JAGC, USNR.

Amici Curiae on behalf of Appellant: *Captain Richard W. Aldrich* (argued)—For Appellate Defense Division, USAF. *Ronald Meister* (argued); *Edward H. Shakin* (on brief)—For American Civil Liberties Union Foundation. *Captain Michael J. Berrigan* (argued); *Colonel Robert B. Kirby, Lieutenant Colonel Russell S. Estey, Captain Cynthia G. Wright* (on brief)—For Defense Appellate Division, U. S. Army. *Roger L. Stavis, Esq.* (argued); *Stephen J. Shapiro* and *Nicholas Kamillatos* (on brief)—For the Association of the Bar of the City of New York Committee on Military Affairs and Justice. *Jeanelle Moseley* (law student) (argued); *Ronald F. Wright* (on brief); *Michelle Davis, Gaylynn Gee, Anne Shaw* (law students)—For Wake Forest University School of Law Clinical Appellate Program. *Steven H. Goldblatt* (on brief); *Kevin M. Hodges, Brian G. Holland, Juan Enrique Mejia* (law students)—For Georgetown University Law Center Appellate Litigation Program.

Amici Curiae on behalf of Appellee: *Captain David G. Nix* (argued); *Colonel Joe R. Lamport* and *Colonel Robert E. Giovagnoni* (on brief); *Major Paul H. Blackwell, Jr.*—For Appellate Government Division, USAF. *Captain Jonathan F. Potter* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Randy V. Cargill, Captain Stephen R. Henley* (on briefs); For Government Appellate Division, U. S. Army *Paul J. Larkin, Jr.* (argued); *William P. Barr* and *Edward S.G. Dennis, Jr.,* Assistant Attorneys General; *Andrew G. McBride,* Associate Deputy Attorney General (on briefs)—For U. S. Department of Justice. *Paul D. Kamenar* (argued); *Daniel J. Popeo* (on brief)—For Washington Legal Foundation.

## Opinion of the Court

EVERETT, Senior Judge:

Appellant was sentenced to death by a general court-martial convened at Camp Lejeune, North Carolina. The issues now before us are whether the President was empowered to prescribe the procedure under which this sentence was adjudged and, if so, whether the rule he prescribed complied with constitutional requirements.

### I

On April 14, 1987, Curtis used a pretext to obtain entry to the home of his supervisor, First Lieutenant James Lotz. His purpose—apparently the result of perceived racial slurs and the imbibing of gin—was to kill Lotz. He carried out his objective with a knife, and then he killed Lotz' wife, Joan.

█ After being apprehended, appellant was charged with the premeditated murder of both victims, the burglary of their home, and various other offenses.[1] The convening authority referred the charges to trial as a capital case; and pursuant to RCM 1004, Manual for Courts–Martial, United States, 1984, the Government notified[2] the defense of the "aggravating factors" on which it would rely.

After the general court-martial found Curtis guilty as charged, the Government offered evidence as to these "aggravating factors": (1) that Lieutenant Lotz' murder was aggravated by the murder of his wife; (2) that Mrs. Lotz' murder was aggravated

---

1. These offenses included larceny of the knife he used to kill the Lotzes; larceny of their automobiles; and indecent assault on Mrs. Lotz after he had stabbed her. These offenses were in violation of Articles 118, 129, 121, and 134, Uniform Code of Military Justice, 10 USC §§ 918, 929, 921, and 934, respectively.

2. At trial the defense questioned the validity of the notice because it only listed two "aggravating circumstances," namely: "a. The murder of Joan M. Lotz was committed while the accused was engaged in the commission of a burglary; and b. The accused ... has been found guilty in the same case of another violation of Article 118." The defense objected to three factors being listed in the instructions and on the sentence worksheet when they were notified of only two. While the judge found the defense was not misled by the notice, it would be advisable for the notice to be precise as to what factors are being relied on for each specification which carries the death penalty.

by the murder of Lieutenant Lotz; and (3) that Mrs. Lotz' murder occurred during a burglary,[3] to wit: breaking and entering into the Lotz home at night with the intent to commit murder. The general court-martial adjudged the death sentence, which the convening authority approved. Thereafter, the Court of Military Review reviewed the case *en banc* and unanimously affirmed the findings of guilty. 28 MJ 1074 (1989). However, Chief Judge Byrne dissented from affirmance of the death sentence, which he concluded was not appropriate in this case (*id.* at 1095–96); and Judge Albertson dissented from affirmance of the sentence because she believed that RCM 1004 was unconstitutional. *Id.* at 1096–1113.

The case reached this Court for mandatory review. *See* Art. 67(a)(1), Uniform Code of Military Justice, 10 USC § 867(a)(1) (1989). After considering the briefs submitted by the parties, as well as various motions, we concluded that two issues—which were discussed extensively in the Court of Military Review, raised in this Court, and are common to any capital case tried by a court-martial—should be separately considered and argued. These issues were:

## I

WHETHER THE CAPITAL PUNISHMENT PROCESS UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS INVALID BECAUSE IT IS AN IMPERMISSIBLE EXTENSION OF PRESIDENTIAL POWER.

## II

WHETHER RULE FOR COURTS–MARTIAL 1004 IS UNCONSTITUTIONAL ON ITS FACE.

Thereafter, we received supplemental briefs from the parties and from various amici curiae and then heard extensive oral argument. Aided by the excellent briefs and argument, we now have concluded that the President acted within his powers in promulgating RCM 1004 and that this Rule otherwise satisfies constitutional requirements.

## II

### A

The Constitution, on its face, does not single out capital cases for special treatment. This point was made in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)—overruling *Betts v. Brady*, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), which had drawn a distinction between capital and noncapital cases. Likewise, in *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), the Supreme Court rejected the attempt by Justices Frankfurter and Harlan to draw a line between capital and noncapital cases with respect to military jurisdiction over civilian defendants abroad.

■ The Supreme Court, however, has now made clear that the Eighth Amendment requires a different treatment of death-penalty cases. Thus, in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a majority of the justices agreed that the arbitrary and capricious imposition of capital punishment—which, in their view, characterized most state procedures—violated the Eighth Amendment. *Cf. Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Likewise, in applying double jeopardy protections, a capital case is treated differently from other cases. *Cf. Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

We observe, also, that in practice, the issues raised by capital cases occupy a significant amount of the time spent by appel-

---

**3.** The Government relied on a "constructive breaking" by means of a pretext. *See* para. 55c(2), Manual for Courts Martial, United States, 1984. Curtis had come to the Lotz home at 2:00 a.m. and had pretended that another Marine had been in an accident. Lieutenant Lotz invited Curtis in while he phoned for assistance. While Lotz was phoning, appellant stabbed him.

late courts. Thus, in its 1989 term, nine cases decided by the Supreme Court were capital.[4] The collateral attacks and multiple reviews in capital cases have posed problems of judicial administration which have troubled Congress, the Supreme Court, the legal profession, and the public.

In regulating military justice, Congress has exhibited a special concern for capital cases. Most of the punitive articles of the Uniform Code of Military Justice provide that a convicted person "shall be punished as a court-martial may direct"; and only for a few crimes—such as wartime desertion, mutiny, sedition, espionage, murder, and rape—is a court-martial empowered to impose "death or such other punishment as a court-martial may direct." *See, e.g.,* Arts. 85(c), 94(b), 106a(a)(1), 118, and 120(a), UCMJ, 10 USC §§ 885(c), 894(b) 906a(a)(1), 918, and 920(a), respectively.[5] Article 45(b) of the Uniform Code, 10 USC § 845(b), prohibits a guilty plea in a capital case. Article 49(f), UCMJ, 10 USC § 849(f), limits use of depositions in capital cases. The third clause of Article 134, UCMJ, 10 USC § 934, incorporates the federal criminal code into military justice, but it only does so with respect to "crimes and offenses not capital."

### B

In *United States v. Matthews,* 16 MJ 354 (CMA 1983), this Court considered the constitutionality of the sentencing procedure then prescribed for capital cases by the Manual for Courts–Martial. In some respects, this procedure met the requirements which we held had been established by *Furman v. Georgia, supra,* and succeeding Supreme Court cases—requirements which we concluded were applicable to courts-martial. For example, trials by courts-martial are bifurcated—the sentenc-ing proceedings being separate from the adjudication of guilt. The accused has unlimited opportunity to present mitigating and extenuating evidence, which the military judge must identify to the court members for their deliberations on sentence. Moreover, mandatory review of the facts, the law, and the appropriateness of sentence is provided in death cases—as well as in most other cases tried by general court-martial.

The principal defect that *Matthews* identified in the military justice system was that neither the Uniform Code of Military Justice nor the Manual for Courts–Martial required the court-martial members to "specifically identify the aggravating factors upon which they have relied in choosing to impose the death penalty." 16 MJ at 379. Thus, upon appellate review, it was impossible to assure that a death penalty adjudged by a court-martial reflected "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Ibid,* quoting *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983).

In *Matthews,* we ruled that either Congress or the President could "take [corrective] action to remedy" the "defect that now exists in the sentencing procedure employed by courts-martial in capital cases." 16 MJ at 380. The majority of this Court concluded that, if new sentencing procedures were authorized, they could be applied retroactively for resentencing Matthews or other servicemembers as to whom death sentences had been adjudged. *Cf. Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). Indeed, we ruled in *Matthews* that if the President or Congress prescribed constitutionally valid

---

**4.** *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255; *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316; *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347; *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369; *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415; *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725; *Whitmore v. Arkansas,* —— U.S. ——, 110 S.Ct. 1717, 109 L.Ed.2d 135; *Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511; *Lewis v. Jeffers,* —— U.S. ——, 110 S.Ct. 3092, 111 L.Ed.2d 606.

**5.** For premeditated murder or felony murder, the punishment imposable under Article 118 is "death or imprisonment for life."

procedures for imposing the death penalty within 90 days after we issued our mandate, the new procedures could be used in resentencing the accused. 16 MJ at 382.

Within the 90-day period that had been allowed by this Court, President Reagan amended the Manual for Courts-Martial to provide a new procedure for capital cases. Exec. Order No. 12,460, 49 Fed.Reg. 3169 (1984). However, this amendment, by its own terms (§ 6), was prospective in application and was not intended to apply to Matthews or any other servicemember whose case had already been tried.

The death penalty procedure authorized by the President in January 1984 became RCM 1004 in the Manual for Courts-Martial, United States, 1984. When Congress amended the Uniform Code in 1985 by adding Article 106a—Espionage, and authorized the death penalty for this crime, RCM 1004 was amended to specify some additional "aggravating factors" for members of a court-martial to consider in deciding on a death penalty. § 1k(4), Exec. Order No. 12,550, 51 Fed.Reg. 6497, 6498 (1986).

We are now asked by appellant to reconsider our conclusion in *Matthews* that the President may constitutionally define the circumstances under which a death penalty may be imposed by a court-martial. Furthermore, appellant maintains that, in its present form, RCM 1004 is unconstitutional on its face.

### III

### A

RCM 1004, which is captioned "Capital cases," currently provides:

(a) *In general.* Death may be adjudged only when:

(1) Death is expressly authorized under Part IV of this Manual for an offense of which the accused has been found guilty or is authorized under the law of war for an offense of which the accused has been found guilty under the law of war; and

(2) The accused was convicted of such an offense by the concurrence of all the members of the court-martial present at the time the vote was taken; and

(3) The requirements of subsections (b) and (c) of this rule have been met.

(b) *Procedure.* In addition to the provisions in R.C.M. 1001, the following procedures shall apply in capital cases—

(1) *Notice.* Before arraignment, trial counsel shall give the defense written notice of which aggravating factors under subsection (c) of this rule the prosecution intends to prove. Failure to provide timely notice under this subsection of any aggravating factors under subsection (c) of this rule shall not bar later notice and proof of such additional aggravating factors unless the accused demonstrates specific prejudice from such failure and that a continuance or a recess is not an adequate remedy.

(2) *Evidence of aggravating factors.* Trial counsel may present evidence in accordance with R.C.M. 1001(b)(4) tending to establish one or more of the aggravating factors in subsection (c) of this rule.

(3) *Evidence in extenuation and mitigation.* The accused shall be given broad latitude to present evidence in extenuation and mitigation.

(4) *Necessary findings.* Death may not be adjudged unless—

(A) The members find that at least one of the aggravating factors under subsection (c) existed;

(B) Notice of such factor was provided in accordance with paragraph (1) of this subsection and all members concur in the finding with respect to such factor; and

(C) All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under R.C.M. 1001(b)(4), including the factors under subsection (c) of this rule.

(5) *Basis for findings.* The findings in subsection (b)(4) of this rule may be based on evidence introduced before or after findings under R.C.M. 921, or both.

(6) *Instructions.* In addition to the instructions required under R.C.M. 1005, the military judge shall instruct the members of such aggravating factors under subsection (c) of this rule as may be in issue in the case, and on the requirements and procedures under subsections (b)(4), (5), (7), and (8) of this rule. The military judge shall instruct the members that they must consider all evidence in extenuation and mitigation before they may adjudge death.

(7) *Voting.* In closed session, before voting on a sentence, the members shall vote by secret written ballot separately on each aggravating factor under subsection (c) of this rule on which they have been instructed. Death may not be adjudged unless all members concur in a finding of the existence of at least one such aggravating factor. After voting on all the aggravating factors on which they have been instructed, the members shall vote on a sentence in accordance with R.C.M. 1006.

(8) *Announcement.* If death is adjudged, the president shall, in addition to complying with R.C.M. 1007, announce which aggravating factors under subsection (c) of this rule were found by the members.

(c) *Aggravating factors.* Death may be adjudged only if the members find, beyond a reasonable doubt, one or more of the following aggravating factors:

(1) That the offense was committed before or in the presence of the enemy, except that this factor shall not apply in the case of a violation of Article 118 or 120;

(2) That in committing the offense the accused—

(A) Knowingly created a grave risk of substantial damage to the national security of the United States; or

(B) Knowingly created a grave risk of substantial damage to a mission, system, or function of the United States, provided that this subparagraph shall apply only if substantial damage to the national security of the United States would have resulted had the intended damage been effected;

(3) That the offense caused substantial damage to the national security of the United States, whether or not the accused intended such damage, except that this factor shall not apply in case of a violation of Article 118 or 120;

(4) That the offense was committed in such a way or under circumstances that the lives of persons other than the victim, if any, were unlawfully and substantially endangered, except that this factor shall not apply to a violation of Articles 104, 106a, or 120;

(5) That the accused committed the offense with the intent to avoid hazardous duty;

(6) That, only in the case of a violation of Article 118 or 120, the offense was committed in time of war and in territory in which the United States or an ally of the United States was then an occupying power or in which the armed forces of the United States were then engaged in active hostilities;

(7) That, only in the case of a violation of Article 118(1):

(A) The accused was serving a sentence of confinement for 30 years or more or for life at the time of the murder;

(B) The murder was committed while the accused was engaged in the commission or attempted commission of any robbery, rape, aggravated arson, sodomy, burglary, kidnapping, mutiny, sedition, or piracy of an aircraft or vessel, or was engaged in flight or attempted flight after the commission or attempted commission of any such offense;

(C) The murder was committed for the purpose of receiving money or a thing of value;

(D) The accused procured another by means of compulsion, coercion, or a promise of an advantage, a service, or a thing of value to commit the murder;

(E) The murder was committed with the intent to avoid or to prevent lawful

apprehension or effect an escape from custody or confinement;

(F) The victim was the President of the United States, the President-elect, the Vice President, or, if there was no Vice President, the officer in the order of succession to the office of President of the United States, the Vice–President–elect, or any individual who is acting as President under the Constitution and laws of the United States, any Member of Congress (including a Delegate to, or Resident Commissioner in, the Congress) or Member–of–Congress elect, justice or judge of the United States, a chief of state or head of government (or the political equivalent) of a foreign nation, or a foreign official (as such term is defined in section 1116(b)(3)(A) of title 18, United States Code), if the official was on official business at the time of the offense and was in the United States or in a place described in Mil.R.Evid. 315(c)(2), 315(c)(3);

(G) The accused then knew that the victim was any of the following persons in the execution of office: a commissioned, warrant, noncommissioned, or petty officer of the armed services of the United States; a member of any law enforcement or security activity or agency, military or civilian, including correctional custody personnel; or any firefighter;

(H) The murder was committed with intent to obstruct justice;

(I) The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim;

(J) The accused has been found guilty in the same case of another violation of Article 118;

(8) That only in the case of a violation of Article 118(4), the accused was the actual perpetrator of the killing;

(9) That, only in the case of a violation of Article 120:

(A) The victim was under the age of 12; or

(B) The accused maimed or attempted to kill the victim;

(10) That, only in the case of a violation of the law of war, death is authorized under the law of war for the offense;

(11) That, only in the case of a violation of Article 104 or 106a:

(A) The accused has been convicted of another offense involving espionage or treason for which either a sentence of death or imprisonment for life was authorized by statute; or

(B) That in committing the offense, the accused knowingly created a grave risk of death to a person other than the individual who was the victim.

For purposes of this rule, "national security" means the national defense and foreign relations of the United States and specifically includes: a military or defense advantage over any foreign nation or group of nations; a favorable foreign relations position; or a defense posture capable of successfully resisting hostile or destructive action from within or without.

(d) *Spying.* If the accused has been found guilty of spying under Article 106, subsections (a)(2), (b), and (c) of this rule and R.C.M. 1006 and 1007 shall not apply. Sentencing proceedings in accordance with R.C.M. 1001 shall be conducted, but the military judge shall announce that by operation of law a sentence of death has been adjudged.

(e) *Other penalties.* Except for a violation of Article 106, when death is an authorized punishment for an offense, all other punishments authorized under R.C.M. 1003 are also authorized for that offense, including confinement for life, and may be adjudged in lieu of the death penalty, subject to limitations specifically prescribed in this Manual. A sentence of death includes a dishonorable discharge or dismissal, as appropriate. Confine-

ment is a necessary incident of a sentence of death but not a part of it. (Discussion omitted.)

B

■ If "aggravating factors" used in channeling the discretion of the sentencing authority in death cases were elements of the crime, we would have no choice but to hold that they must be set forth by Congress and cannot be prescribed by the President. Consistent with Article I of the Constitution, only Congress has the power to legislate; and definition of the elements of a crime clearly is legislation. However, the Supreme Court has made clear that "aggravating factors" are not "elements" of a crime. *Cf. Walton v. Arizona*, 497 U.S. ——, —— 110 S.Ct. 3047, 3054–55, 111 L.Ed.2d 511, 525 (1990). For this reason a defendant has no right to a jury trial as to the existence of aggravating factors, and the sentencer's rejection of a particular circumstance is not an "acquittal" of that circumstance for double jeopardy purposes. Cf. *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

■ Is it consistent, then, with the separation of powers required by the Constitution for the President to prescribe these "aggravating factors"? The recent decision of the United States Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), provides us with guidance.

There the Court considered the constitutionality of sentencing guidelines issued by the Sentencing Commission, which is chaired by a Federal circuit judge and has other judges among its members. The defendant complained that the commission and its guidelines were unconstitutional because promulgation of guidelines was a legislative task which should have been performed by Congress and because "the separation of powers doctrine" was violated by allowing active members of the judiciary to serve on the commission. How-

ever, the Supreme Court concluded, over Justice Scalia's vigorous dissent, that establishment of the commission had not violated separation-of-powers requirements and that the guidelines had been constitutionally promulgated.[6]

In *Mistretta*, the Court seemed willing to allow considerable flexibility and innovativeness in the allocation of power among governmental institutions. Apparently its chief concern was that one branch of Government not aggrandize itself at the expense of another. However, in *Mistretta* this fear was allayed because Congress had established the Sentencing Commission and had defined the task which it wished the Commission to perform. A year before the Court took a similar tack in upholding legislation which provided for an Independent Counsel. *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

Unlike an Independent Counsel or members of the Sentencing Commission, the President holds an office specifically authorized by the Constitution. Moreover, he has been invested by the Constitution with the "executive Power," Art. II, § 1, and is the Commander-in-Chief of the Armed Forces. Art. II, § 2. In view of his inherent constitutional authority, a separation-of-powers objection has much less merit in the present context than if the "aggravating factors" for capital cases tried by courts-martial had been formulated by a specially created commission.

We are mindful, however, of the separation-of-powers analysis in Justice Jackson's often cited concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). There, in dealing with the seizure of steel mills during the Korean War, Justice Jackson suggested that the President's power is the greatest when he acts under a specific delegation from Congress; is less when he acts without delegation, but as to a subject concerning which Congress has not legis-

---

**6.** In footnote 11 of its opinion in *Mistretta*, the Supreme Court discussed the Sentencing Commission's authority with respect to the death

penalty. 488 U.S. 361, 378, 109 S.Ct. 647, 657–58, 102 L.Ed.2d 714 (1989).

lated; and is the least when he acts on the basis of his inherent constitutional authority and against the express or implied wishes of Congress. *See* 343 U.S. at 635–38, 72 S.Ct. at 870–72. Presidential power to prescribe the "aggravating factors" in RCM 1004 is more sustainable if it has been expressly or implicitly conferred by Congress, or if Congress, at least, has displayed no desire to legislate in this field and a willingness to let the President take action.

It is clear that Congress has been willing for the President to play the major role in determining what punishments may be imposed by courts-martial. Most of the punitive articles in the Uniform Code provide that a convicted accused "shall be punished as a court-martial may direct." Under Article 56, UCMJ, 10 USC § 856, "[t]he punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense." Article 18, UCMJ, 10 USC § 818, states that a general court-martial "may, *under such limitations as the President may prescribe,* adjudge any punishment not forbidden by [the Code], including the penalty of death when specifically authorized by" the Code. (Emphasis added.) When these Articles are taken together, they reveal that—instead of legislating maximum punishments as it has done in Title 18 of the United States Code for cases tried in the District Courts—Congress has decided that the President shall set the maximum punishments imposable in trials by courts-martial.

Consistent with Articles 18 and 56 of the Code—and previously with comparable provisions of the Articles of War—the President for several decades prescribed maximum punishments in a Table of Maximum Punishments as part of the Manual for Courts–Martial. The current Manual sets the maximum punishments in subparagraph e for each paragraph in Part IV devoted to a particular offense.[7] In some instances, this Table and now the Manual text provide that a maximum punishment is increased because of aggravating circumstances. For example, driving while drunk carries a heavier penalty if it results in death. Para. 35e(1), Part IV, 1984 Manual, *supra.* Desertion terminated by apprehension authorizes a higher maximum punishment than desertion terminated by surrender. Para. 9e(2). The maximum punishment for larceny depends on the value of the property stolen. Para. 46e(1). And so on.

Thus, under a power delegated by Congress, the President has for many years been prescribing aggravating circumstances that would increase the punishment imposable for various offenses tried by courts-martial. Presumably, Congress has been well aware of his exercise of this power because, under Article 36(b) of the Uniform Code, 10 USC § 836(b), the rules and regulations prescribed by the President for courts-martial—including, of course, the maximum punishments—must be reported to Congress.

Since 1951 death penalties have been authorized by several punitive articles of the Uniform Code, and previously they had been permitted by the Articles of War and the Articles for the Government of the Navy. Furthermore, Congress has never displayed any intent to rescind them.

In 1983, when this Court decided *Matthews,* we held that either Congress or the President could prescribe "aggravating factors" for death cases in courts-martial. 16 MJ at 380–81. In view of our analysis in *Matthews,* it should have been apparent that, unless these aggravating factors were prescribed by one branch of government or the other, courts-martial would be precluded from adjudging death penalties.

When, after our *Matthews* decision the President prescribed a new sentencing procedure for death cases, his action was promulgated by Executive Order No. 12,-460, *supra,* which gave notice to Congress and the public at large. We are unaware of any indication of legislative displeasure with the President's action or any legisla-

---

7. Appendix 12 of the Manual lists maximum punishments, but it is not authoritative.

tive effort at that time to undo his action or to curtail the use of capital punishment in courts-martial.

In 1985, Congress enacted legislation which we interpret to be an affirmation of presidential power to prescribe "aggravating factors" for capital cases. The Uniform Code was amended by the addition of Article 106a, which prohibited espionage and authorized punishment "by death or such other punishment as a court-martial may direct." Art. 106a(a)(1). In connection with its death penalty, Article 106a provided:

(b)(1) No person may be sentenced by court-martial to suffer death for an offense under this section (article) unless—

(A) the members of the court-martial unanimously find at least one of the aggravating factors set out in subsection (c); and

(B) the members unanimously determine that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances, including the aggravating factors set out in subsection (c).

(2) Findings under this subsection may be based on—

(A) evidence introduced on the issue of guilt or innocence;

(B) evidence introduced during the sentencing proceeding; or

(C) all such evidence.

(3) The accused shall be given broad latitude to present matters in extenuation and mitigation.

(c) A sentence of death may be adjudged by a court-martial for an offense under this section (article) only if the members unanimously find, beyond a reasonable doubt, one or more of the following aggravating factors:

(1) The accused has been convicted of another offense involving espionage or treason for which either a sentence of death or imprisonment for life was authorized by statute.

(2) In the commission of the offense, the accused knowingly created a grave risk of substantial damage to the national security.

(3) In the commission of the offense, the accused knowingly created a grave risk of death to another person.

(4) *Any other factor that may be prescribed by the President by regulations under section 836 of this title (article 36).*

Pub.L. No. 99–145, title V, § 534(a), 99 Stat. 634 (1985) (emphasis added).

Two features of this legislation are noteworthy. First, the procedure prescribed by Article 106a conforms generally to the procedure which the President previously had prescribed in RCM 1004. Secondly, the President is specifically authorized by Article 106a(c)(4) to prescribe other "aggravating factors" in addition to the three that are set forth in Article 106a(c)(1)-(3). This authority is linked in (c)(4) of that Article to the power granted him by Article 36(a) of the Uniform Code to prescribe "[p]retrial, trial, and post-trial procedures, including modes of proof," for trials by courts-martial.[8]

In connection with the provision for death-penalty sentence proceedings in Article 106a, H.R. Conference Report No. 235, 99th Cong., 1st Sess., states:

The conferees did, however, adopt a statutory formulation of capital sentencing standards for espionage cases and intend that those standards be implemented in a manner consistent with the provision of Rule for Courts–Martial 1004 of the Manual for Courts–Martial, 1984. The conferees do not intend that the enactment of statutory capital sentencing standards for the new Article 106a be construed as affecting the validity of the regulatory capital sentencing standards *that already exist for the other capital punishment articles.*

**8.** Under Article 36(b), UCMJ, 10 USC § 836(b), the rules and regulations promulgated under Article 36(a) "shall be reported to Congress."

DOD Authorization Act of 1986, Pub.L. No. 99–145, 1985 U.S.Code Cong. & Admin. News, 571, 579 (emphasis added). If failure of Congress to complain about the content of regulations can be construed to be ratification, *cf. Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, AFL–CIO*, 367 U.S. 396, 408–09, 81 S.Ct. 1529, 1535–36, 6 L.Ed.2d 924 (1961), the provisions of Article 106a—along with its legislative history—are even clearer evidence of ratification.

As heretofore mentioned, the Supreme Court has made clear its concern that one branch of government not grab any power which the Constitution has conferred on another branch. *Cf. Mistretta* and *Morrison*, both *supra; Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). By implication Article 106a affirms that Congress does not consider the President's prescribing "aggravating factors" to be in diminution of its own legislative power. Instead, Congress undoubtedly has concluded that, in view of the major role that for decades it has delegated to the President in prescribing limitations on maximum punishment, it is better for the President to prescribe "aggravating factors" by Executive Order than for Congress to attempt to do so by statute.[9]

### C

To the extent we rely on delegation from Congress as a source of presidential power, we are confronted by appellant's argument that Congress failed to prescribe standards for the exercise of the delegated power. *Cf. A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Certainly Congress did not give the President guidance as explicit

as that which the Sentencing Reform Act prescribed for the Sentencing Commission. Indeed, Justice Scalia, the sole dissenter in *Mistretta*, perceived no delegation problem in the creation of that Commission and was concerned chiefly with the claimed violation of separation-of-powers principles.

However, in prescribing "aggravating factors" the President was not left totally without guidance from Congress. Article 106a(c)(4) refers to regulations prescribed by the President under Article 36—which, in turn, directs that the President "shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with" the Uniform Code. *See* Art. 36(a). Apparently Congress wished the President to look to the "principles of law" applied in federal criminal cases in determining what should be the "aggravating factors" for capital cases tried by court-martial. Furthermore, as we examine the "aggravating factors" prescribed by the President in RCM 1004, we find that they reflect policy expressed by Congress in various statutes—including several punitive articles of the Uniform Code of Military Justice—and also conform generally with the Model Penal Code and with policies expressed in the statutes of many of the 36 states which authorize the death penalty.[10]

"Aggravating factor" (1) is commission of the offense "before or in the presence of the enemy." Article 99 of the Code, 10 USC § 899, authorizes death for nine types of misbehavior "before or in the presence of the enemy," and thereby it reflects a legislative judgment that such conduct is very harmful to the military mission.

"Aggravating factor" (2)(A) corresponds to an "aggravating factor" prescribed by

---

**9.** Since we conclude that Congress has—at least, implicitly—delegated this task to the President, we need not consider what inherent authority the President would have in this area. For example, absent any indication of congressional willingness for him to prescribe "aggravating factors," could the President constitutionally do

so? Also, what if Congress attempted to block exercise of this power by the President?

**10.** *See Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 2975 n.2, 2976 n.4, 2978 n.5, 106 L.Ed.2d 306 (1989), for a collection of federal and state statutes concerning the death penalty.

Congress for espionage offenses, *see* Art. 106a(c)(2); and "Aggravating factors" (2)(B) and (3) also correlate with the manifest congressional concern about espionage—a crime for which death is authorized by Article 106a(a)(1) of the Code. *See also* 18 USC § 794.

"Aggravating factor" (4) parallels an "aggravating factor" prescribed by Article 106a(c)(3) and reflects special concern if the crime for which the accused has been convicted created a grave risk of death to others. This "aggravating factor" has parallels in many state statutes authorizing the death penalty.[11]

"Aggravating factor" (5)—which involves commission of the offense "with the intent to avoid hazardous duty"—reflects legislative disapproval of flight from hazardous duty. Thus, desertion with intent to avoid hazardous duty authorizes the death penalty in time of war, *see* Art. 85(a)(2) and (c); and running away from the enemy or cowardly conduct also permits a death penalty, *see* Art. 99(1) or (5).

"Aggravating factor" (6)—which applies to murders and rapes in time of war—deals with conduct which violates the law of war; and thereby threatens international relations. The death penalty is not unusual for violations of the law of war; *see, e.g., In re Yamashita,* 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946)[12]; *Ex Parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed.3 (1942); and perhaps the constitutional restrictions derived from *Furman* may not even apply to such violations. *Cf. Yamashita* and *Quirin.*

"Aggravating factor" (7)—applies only to premeditated murder in violation of Article 118(1) and is the only "aggravating factor" involved in appellant's case. This "aggravating factor" has ten subparts. As

explained in the Drafters' Analysis of this rule, *see* Manual for Courts–Martial, United States, 1984, at A21–66 (Change 2), these "aggravating factors" were to a considerable extent derived from those contained in the state statutes enacted in response to *Furman v. Georgia, supra.*

Factor (7)(A) applies to an accused "serving a sentence of confinement for 30 years or more or for life at the time of the murder." This factor is intended to express disapproval of premeditated murder by an accused who has already been convicted of a very serious crime. Also, it may provide an additional deterrent for someone who might only be deterred by the death penalty.

Factor (7)(B) is that the premeditated murder occurred "while the accused was engaged in the commission or attempted commission of any robbery, rape, aggravated arson, sodomy, burglary, kidnapping, mutiny, sedition, or piracy of an aircraft or vessel, or was engaged in flight or attempted flight after the commission or attempted commission of any such offense."

Congress has severely condemned all of these crimes. Under Article 118(4), murder committed in the course of "burglary, sodomy, rape, robbery, or aggravated arson" permits a death sentence and requires at least life imprisonment. Mutiny and sedition are themselves capital offenses under Article 94. Piracy long has been viewed as a universal offense against the law of nations and is specifically mentioned in Article I, § 8, cl. 10 of the Constitution. Congress has prescribed the death penalty for skyjacking under certain circumstances— 49 USC App § 1472(i)(1)(B) (aircraft piracy resulting in death authorizes the death penalty).[13] Kidnapping also is severely con-

---

**11.** *Commonwealth v. Smith,* 518 Pa. 15, 540 A.2d 246, 260 (1988); *Jones v. State,* 520 So.2d 543, 551–52 (Ala.1988); *Stouffer v. State,* 738 P.2d 1349, 1361 (Okl.Cr.1987); *Hogan v. State,* 103 Nev. 21, 732 P.2d 422, 424 (1987); *Way v. State,* 496 So.2d 126, 128 (Fla.1986).

**12.** Article 106, UCMJ, 10 USC § 906, which is based on the law of war, applies not only to servicemembers but also to civilians. Whether

its mandatory death penalty is constitutional is open to question. *Cf. Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

**13.** Whether the authorized penalty of death if the death of another person occurs as a result of the air piracy is constitutionally sustainable may be questioned since the statute requires no

demned by the Federal criminal code, 18 USC § 1201(a)—although the death penalty, which at one time Congress authorized for this crime, was subsequently held unconstitutional in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

Factors (7)(C), (7)(D), and (7)(E)—which involve, respectively, murder "for the purpose of receiving" something of value, "procur[ing] another ... to commit the murder," or committing the murder "to avoid or to prevent lawful apprehension or effect an escape"—have counterparts in many state statutes. *See, e.g., Ariz. Rev. Stat. Ann.* 13–703(F)(5) (Supp.1988) (which includes as a factor that the homicide was committed with the expectation of receiving something of value); *see also Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 3051, 111 L.Ed.2d 511 (1990). Of course, resistance of apprehension and escape are offenses under the Uniform Code. *See* Art. 95, 10 USC § 895.

"Aggravating factor" (7)(F)—concerns the official status or duties of the victim, and it corresponds with recent legislation seeking to protect various public officials. *See, e.g.,* 18 USC §§ 351 and 1751.

Factor (7)(G) centers on the victim's execution of his military office or his duties, military or civilian, in law enforcement, security, or firefighting. At least to some extent, this "aggravating factor" recognizes a congressional intent to protect persons performing duties important to public safety. *Cf.* 18 USC § 1114; Arts. 90 and 91, UCMJ, 10 USC §§ 890 and 891, respectively.

"Aggravating factor" (7)(H) concerns "intent to obstruct justice." Obstruction of justice is a recognized federal crime. 18 USC §§ 1501–15. In military practice obstruction or interference with the administration of justice is not limited to those acts enumerated in the federal criminal code—

*United States v. Jones,* 20 MJ 38, 40 (CMA 1985); *United States v. Long,* 2 USCMA 60, 6 CMR 60 (1952); but under the facts here we need not decide which definition should be applied to the act alleged to have aggravated the offense.

"Aggravating factor" (7)(I) resembles an "aggravating factor" in many state statutes for murders described as "heinous, atrocious, or cruel" or in similar terms. However, unlike the state statutes—which have sometimes been successfully attacked as vague—*see Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); and have required limiting judicial construction, *cf. Walton v. Arizona, supra*—this "aggravating factor" is stated clearly in RCM 1004.

"Aggravating factor" (7)(J) is "another violation of Article 118"—*i.e.,* another murder—"in the same case." Since any violation of Article 118 has a maximum punishment either of death or of life imprisonment, this "aggravating factor" is predicated on conduct viewed quite seriously by Congress. Likewise, in many state statutes, a second murder is an "aggravating factor." [14]

"Aggravating factor" (8) applies only in the case of a violation of Article 118(4), and so relates only to felony murders. We have held that an accused may be convicted of murder under Article 118(4) even though he did not kill the victim and only aided and abetted commission of the felony on which the felony-murder conviction was based. *United States v. Jefferson,* 22 MJ 315 (CMA 1986). The Supreme Court has concluded that the Eighth Amendment is violated when a defendant is sentenced to death for a felony murder if he did not participate actively in the killing. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *but cf. Tison v. Arizona,* 481 U.S. 137, 107 S.Ct.

specific findings of aggravation and specifies no aggravating factors.

**14.** *See Townsend v. State,* 533 N.E.2d 1215, 1229 (Ind.1989); *Wallace v. State,* 486 N.E.2d 445,

463 (Ind.1985); *Hightower v. State,* 259 Ga. 770, 386 S.E.2d 509, 511 (1989); *State v. Sloan,* 756 S.W.2d 503, 509, 511 (Mo. banc 1988).

1676, 95 L.Ed.2d 127 (1987) (upholding a death penalty for an accused who did not kill the victim, but whose conduct was related to the killing).

"Aggravating factor" (9) applies only to a violation of Article 120—which authorizes a death penalty for rape. In *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court held that executing a defendant for rape of an adult female would violate the Eighth Amendment. We intimated in *Matthews* that this same principle would apply to trials by courts-martial, "at least, where there is no purpose unique to the military mission that would be served by allowing the death penalty for this offense." 16 MJ at 380.

This "factor" seeks to comply with *Coker* by permitting the death penalty only if "[t]he victim was under the age of 12" or if "[t]he accused maimed or attempted to kill the victim." Congress has manifested its intent that young females be protected from sexual intercourse by creating the offense of carnal knowledge, whereunder a servicemember may be punished for consensual intercourse with a female under 16. Also, Congress has prohibited both maiming, *see* Art. 124, UCMJ, 10 USC § 924, and attempted murder, *see* Art. 80, UCMJ, 10 USC § 880, and Art. 118.

"Aggravating factor" (10) applies to conduct for which "death is authorized under the law of war." The law of war—which is part of the "Law of Nations" within the meaning of Article I, § 8, cl. 10 of the Constitution—provides a separate basis of military jurisdiction from that which exists under Article I, § 8, cl. 14, on which the Uniform Code is based. *In re Yamashita* and *Ex Parte Quirin*, both *supra*. Violations of the law of war may be tried by general court-martial, *see* Art. 18, or by a military commission or some other type of military tribunal. *Cf.* Arts. 104 and 106, UCMJ, 10 USC § 904 and 906, respectively; *In re Yamashita* and *Ex Parte Quirin*, both *supra; Madsden v. Kinsella*, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952). If the line of decisions beginning with *Furman v. Georgia, supra*, applies to violations of the law of war and if an aggravating factor must be established to permit imposition of the death penalty for those violations, it seems appropriate that one "aggravating factor" should be that the law of war recognizes the seriousness of the conduct involved by authorizing the punishment of death.[15]

"Aggravating factor" (11) applies only to violations of Article 104—aiding the enemy—or of Article 106a—espionage. The first alternative is that "[t]he accused has been convicted of another offense involving espionage or treason for which either a sentence of death or imprisonment for life was authorized by statute." Here again, aggravation is found in conduct which Congress has condemned by authorizing punishment of death or life imprisonment.

The other alternative is based on the language of Article 106a(c)(3), whereunder an aggravating factor for the offense of espionage is that "the accused knowingly created a grave risk of death to another person."[16]

From our examination of the "aggravating factors" formulated by the President in RCM 1004, it seems clear that, to a considerable extent the President acted in reliance on legislative policy expressed in the Uniform Code of Military Justice and in other federal statutes. This is especially true with respect to "aggravating factor"

---

**15.** Article 18, UCMJ, 10 USC § 818, authorizes either general courts-martial or other military tribunals to administer the law of war.

**16.** Indeed, the language used in the Rule, which adverts to "grave risk of death to a person other than the individual who was the victim," seems to suggest that, in order for this aggravating factor to apply, the accused not only must have been convicted of aiding the enemy or espionage, but also must have killed one person "who was the victim" and placed in great danger someone else. We doubt that this additional restriction was intended. Nevertheless, since, in describing this "aggravating factor," the President did not use the language, "the victim, if any"—as he did for "aggravating factor" (4)—"aggravating factor" (11)(B) must contemplate a "victim" apart from the person placed at risk.

(7) and its various subparts—which were utilized in adjudging the death penalty in the present case. To the extent the President went outside federal statutes for guidance, he drew upon the Model Penal Code—which has been a source of decisional guidance in military justice, *see, e.g., United States v. Byrd,* 24 MJ 286 (CMA 1987); *United States v. Frederick,* 3 MJ 230 (CMA 1977); *United States v. Thomas,* 13 USCMA 278, 32 CMR 278 (1962)—and upon patterns discerned in state death-penalty legislation.

We note also that RCM 1004 is more specific in prescribing aggravating factors than is true of many state statutes. It does not use terms like "heinous," "vile," "atrocious," and "cruel"—which present issues of vagueness and necessitate extensive judicial construction. *See, e.g., Walton v. Arizona, Maynard v. Cartwright,* and *Godfrey v. Georgia,* all *supra.* Thus, the "aggravating factors" under RCM 1004 are easier to apply than some civilian counterparts.

As has already been emphasized, the "aggravating factors" which President Reagan prescribed in January 1984 and which were incorporated in Manual for Courts-Martial, United States, 1984, were known to Congress. In enacting Article 106a in 1985, Congress specifically authorized the President to prescribe "aggravating factors" for espionage prosecutions in addition to those prescribed by Congress. Art. 106a(c)(4). We interpret this express congressional delegation to signify approval of the standards which the President theretofore had employed in prescribing "aggravating factors" for use in capital cases. RCM 1004(c).

Although the guidance provided by Congress to the President was not so specific as that which Congress gave to the Sentencing Commission, *see Mistretta v. United States, supra,* the President was not set adrift in an uncharted sea. Instead, in prescribing "aggravating factors," he was

guided by the Uniform Code and other federal legislation and by a pattern of legislative intent discernible in the state statutes. Moreover, Congress not only acquiesced in his performance of this task but also tacitly ratified the "aggravating factors" when it enacted Article 106a of the Uniform Code.

## IV

■ Appellant has vigorously attacked the constitutionality of RCM 1004, as promulgated by the President. He claims that the Rule should require the court-martial to have at least 12 members at all times.[17] Appellant recognizes that courts-martial are not subject to the jury-trial requirements of the Sixth Amendment, *see Ex parte Quirin,* 317 U.S. at 39–45, 63 S.Ct. at 16–19; but he reasons that to allow a death penalty to be imposed by less than 12 members violates the Eighth Amendment. His premise is that, even though juries in state courts are not required constitutionally to have 12 members, *see Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), those states in which juries do participate in imposing the death penalty use 12-member juries for this task. Moreover, the Supreme Court has recognized that the number of jurors is related somewhat to the reliability of their decision, and therefore no state jury may be reduced below 6 in number without violating due process. *Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978). Appellant claims that, if there are at least 12 court-martial members, there will be an input of diverse viewpoints, so that any decision on imposing capital punishment is less likely to be arbitrary or capricious.

The defense concedes that a civilian judge alone may be entrusted with imposing the death sentence, *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Walton v. Arizona, supra;* and he may even be empowered to override a jury recommendation for life

17. In appellant's case, there were originally 15 members of the court-martial, but after challenges, the number was reduced to 9.

imprisonment. *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). However, appellant points out that a judge has a professional background which qualifies him for his sentencing task, while court-martial members lack similar experience.

Under RCM 1004, the court-martial members—who have been chosen pursuant to the criteria set forth in Article 25 of the Code, 10 USC § 825—must be unanimous in finding aggravating factors.[18] The military judge can, at least, recommend a commutation of a death sentence adjudged;[19] and the convening authority is empowered to commute the sentence. Furthermore, a Court of Military Review, composed of trained appellate military judges, must thoroughly review the law, the facts, and the appropriateness of the accused's sentence. In view of all these safeguards, we are not convinced that a court-martial must have 12 members in a capital case when this is not required in any other type of trial.

Under RCM 1004, the members must unanimously find at least one of the listed aggravating factors. Unlike the procedure under some state statutes upheld by the Supreme Court, *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), there is no "aggravating factor" which *compels* the sentencing authority to impose the death sentence.[20] Instead, all the court-martial members must "concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances ... including the factors under" RCM 1004(c). RCM 1004(b)(4)(C).

The defense seems to complain that RCM 1004 does not prescribe any mitigating

factors to be found by the members of the court-martial. However, by omitting provision for such findings, this rule avoids the problem posed in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and in *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). There the instructions of the trial judge were construed by the Supreme Court to mean that a mitigating factor could not be considered at all unless all the jurors concurred in finding that it existed. Thus, such an instruction might enable a juror who wanted the death penalty imposed to hold out against any findings that mitigating factors existed. Instead, RCM 1004 allows an accused broad leeway to bring to the attention of the court-martial members any information which he believes would mitigate his sentence. *Cf. Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Appellant has contended that RCM 1004 is defective because it lacks any provision to prevent racial bias—like that included in a recently enacted federal anti-drug statute. Section 848(*o*) of Title 21, USC, requires that, in a drug case where the death penalty is authorized, the jury be instructed not to "consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim." This statute did not become effective until after appellant's trial (102 Stat. 4545) and, by its own terms, applies only to jury trials in federal district courts. Its requirements—however desirable they may be[21]—are not constitutionally mandated; otherwise, the Supreme Court would have applied them to capital cases tried by state courts.[22]

---

**18.** Unanimity is not always required by state law. *See Jackson v. State,* 530 So.2d 269, 271 (Fla.1988)—the vote to recommend the death penalty was 7–5; *Parker v. State,* 476 So.2d 134 (Fla.1985)—the vote was 8–4.

**19.** We need not decide now whether the military judge is himself empowered to set aside a death sentence that he considers disproportionate or otherwise defective.

**20.** If the President had attempted to require that a death sentence be adjudged if an "aggravating factor" were found, we believe he would clearly have exceeded his constitutional authority.

**21.** The military judge could give such instructions *sua sponte* or if requested by the defense. Such an instruction certainly seems desirable.

**22.** Curtis, who is black, was tried by a panel which included several blacks. Despite his

Appellant contends that court-martial members would be misled by the sentencing procedure, because they must find "any aggravating factors" but they do not make findings as to "mitigating factors." His assumption is that, if one or more "aggravating factors" are found and no "mitigating factors" are specifically found, the members will inevitably conclude that the "aggravating factors" substantially outweigh the "mitigating factors." Under this view, the President's attempt to allow the members the maximum leeway to consider mitigating evidence—in compliance with the principles announced in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Lockett v. Ohio, supra*—is deemed to be a vice rather than a virtue. While there might be some advantages in the procedure urged by the defense for finding mitigating factors, there also can be disadvantages—as evidenced by *McKoy v. North Carolina* and *Mills v. Maryland*, both *supra*. We believe that the President made a constitutionally permissible choice.

■ The defense insists that RCM 1004 should require a separate finding by the members that "any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances." We are convinced, however, that the weighing of aggravating against mitigating factors can be adequately handled by instructions to the members that they must all concur as to this imbalance and does not require a separate finding. *United States v. Evans*, 27 MJ 34, 40 (CMA 1988), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989). Such instructions were given here.

In sum, as we construe RCM 1004, it not only complies with due process requirements but also probably goes further than most state statutes in providing safeguards for the accused.

## V

This case provides an example of matters that must be considered during appellate review before a death sentence can be approved. Here, one of the "aggravating factors" found by the court-martial was that Mrs. Lotz had been killed by appellant in the perpetration of a burglary. However, two other "aggravating factors" were submitted to the members. Specifically, the members found:

PRES: Lance Corporal Ronnie A. Curtis, United States Marine Corps, this court-martial finds that the following aggravating factors have been proven beyond a reasonable doubt:

That with regard to the premeditated murder of Mrs. Joan M. Lotz, the premeditated murder of her was committed while the accused, Lance Corporal Ronnie A. Curtis, U.S. Marine Corps, was engaged in the commission of a burglary;

That with regard to the premeditated murder of Mrs. Joan M. Lotz, that the accused, Lance Corporal Ronnie A. Curtis, has been found guilty in the same case of another murder, to wit: That of Lieutenant James F. Lotz, United States Marine Corps Reserve, in violation of Article 118, Uniform Code of Military Justice; and

That with regard to the premeditated murder of Lieutenant James F. Lotz, U.S. Marine Corps Reserve, the accused, Lance Corporal Ronnie A. Curtis, U.S. Marine Corps, has been found guilty in the same case of another murder, to wit: that of Mrs. Joan M. Lotz, in violation of Article 118, Uniform Code of Military Justice.

■ Either of these latter two "factors" meet the criteria of RCM 1004(c)(7)(J): "The accused has been found guilty in the *same case* of another violation of Article 118;...." (Emphasis added.) There is some authority to the effect that the separate findings as to these two "factors" might represent a double counting of "aggravating factors"; and, hence, one of the findings might need to be vacat-

---

claim that he had killed Lieutenant Lotz in a rage provoked by the victim's racial prejudice,

the members voted unanimously for the death penalty.

ed. *People v. Harris,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 801, 679 P.2d 433, 452 (1984), *cert. denied,* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *Wilson v. State,* 300 S.E.2d 640, 648, (Ga.), *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); *State v. Goodman,* 257 S.E.2d 569 (NC 1979). We leave open this issue for consideration during further proceedings in this case. However, we observe that setting aside one "aggravating factor" where others remain does not mandate vacating the death sentence. *Clemons v. Mississippi, supra.* If it is decided hereafter that only two—rather than three—"aggravating factors" should have been found by the court-martial, then it will be necessary for the Court of Military Review to determine whether the death sentence would have been adjudged at trial if only two "factors" had been found. *Cf. United States v. Sales,* 22 MJ 305 (CMA 1986); *United States v. Suzuki,* 20 MJ 248 (CMA 1985).

Article 66(c) UCMJ, 10 USC § 866(c), provides that, "[i]n a case referred to it, the Court of Military Review ... may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, *as it finds correct in law and fact* and determines, *on the basis of the entire record,* should be approved." (Emphasis added.) This extensive appellate review, which includes review of appropriateness of sentence, seems unique to military justice. However, many states provide for review of death sentences—usually referred to as a "proportionality review." *See, e.g., Gregg v. Georgia, supra,* 428 U.S. 153, 96 S.Ct. 2909.

 This review is not constitutionally required in civilian cases where the statutory procedures adequately direct the sentencing authority's exercise of discretion. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 306, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262, 288 (1987); *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In view of the safeguards prescribed by RCM 1004, we are convinced that a "proportionality review" is not required by the Eighth Amendment, which prohibits "cruel and unusual punishments," or by Article 55, 10 USC § 855, which prohibits "cruel or unusual punishment." However, we conclude that such a review is encompassed within the responsibility for determining appropriateness of sentence under Article 66 of the Code. Likewise, in the unique context of the death penalty, we believe that Congress intended for our Court to oversee this review in order to assure that it is properly performed.

In *Solem v. Helm,* 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637, 650 (1983), the Supreme Court stated:

> In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

 With this guidance in mind, we conclude that proportionality review *need not* be limited to death sentences from the accused's own Service or even to death sentences imposed by courts-martial.[23]

---

**23.** An interesting South Carolina case deals with a proportionality review of a death sentence where there had been no prior death sentences in that jurisdiction that could be used for comparison. *See State v. Shaw,* 273 S.C. 194, 255 S.E.2d 799, 807 (1979):

> We have compared the death sentences imposed upon appellants with the sentences imposed in all prior capital cases tried under the current death penalty statutes and are satisfied that there are no similar cases against which the proportionality of the sentences imposed upon appellants can be measured.

> The inability of this Court to compare this case with any other similar cases does not require, however, that appellants' sentences be set aside. Any system of review that requires a comparison of each case with all similar prior cases must have a beginning. There will be a first case for each type or category of capital case that may appear and that first case necessarily cannot be compared to any other similar cases. The first case must stand alone, otherwise comparative sentence review would be forever impossible.

(Footnote omitted.)

■ Accordingly, before a death sentence adjudged by a court-martial can be approved, the Court of Military Review must determine: (a) whether one or more valid aggravating factors have been unanimously found by the court-martial and this finding is factually and legally correct; (b) if any corrective action results in setting aside any such finding but leaves intact at least one "aggravating factor," whether this error affected imposition of the sentence; (c) whether the death sentence adjudged is proportionate to other death sentences that have been imposed; and (d) whether under all of the facts and circumstances of the case the death sentence is appropriate, Art. 66(c).

## VI

We shall set this case for further argument to dispose of the remaining questions which have been raised by the defense. After deciding them, we shall issue our mandate.

SULLIVAN, Chief Judge (concurring):

I concur with the scholarly and excellent opinion of Senior Judge Everett concerning the constitutionality of RCM 1004, Manual for Courts–Martial, United States, 1984. However, I reserve judgment on the effect of Article 66, Uniform Code of Military Justice, 10 USC § 866, on this case since such a holding is not required to answer the specified issues decided today.

It is my personal view, however, that, in peacetime, a servicemember in a capital

case should be tried by a 12–member court-martial. The value of a soldier's life is surely equal to the value of the life of his fellow citizens. *Cf. Williams v. Florida,* 399 U.S. 78, 103, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 446 (1970). Nevertheless, neither the Constitution itself, nor Congress in legislation, nor the President by regulation has mandated a 12–member panel in a military capital case. *See generally* Van Loan, *The Jury, The Court–Martial, and The Constitution,* 57 Cornell L. Rev. 363, 384 n.118 (1972). Moreover, it is the duty of this Court to apply the law of the land, not to legislate by judicial fiat, and therefore, it is beyond our power to mandate such a procedure. Finally, appellant himself, by use of his challenges, reduced in part the number of court members detailed to this case from 15 to 9. Moreover, he did not particularly object to trial by 9 members at this court-martial or request the detail of additional members. I could not find reversible error in these circumstances even if appellant was somehow entitled to a 12–member panel.

COX, Judge (concurring):

I concur with the resolution of the specified issues before us. I write only to reserve judgment on some other matters discussed by Senior Judge Everett which are used to illustrate the rationale of his decision.

This was the first capital punishment case reviewed in South Carolina under death penalty statutes revised after *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).